

U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

TAWANA C. MARSHALL, CLERK
THE DATE OF ENTRY IS
ON THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed July 21, 2014**

**United States Bankruptcy Judge**

_____

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 12-32785-BJH |
| H&M OIL & GAS, LLC, | § | (Chapter 7) |
| | § | |
| DEBTOR. | § | |
| | § | |
| _____ | § | |
| | § | |
| DOUGLAS J. BRICKLEY, CHAPTER 11 TRUSTEE, | § | ADV. PROC. NO. 13-3066-BJH |
| | § | |
| PLAINTIFF, | § | |
| v. | § | |
| | § | |
| SCATTERED CORPORATION and LEON A. GREENBLATT, III, | § | |
| | § | |
| DEFENDANTS. | § | |
| | § | |

## <u>MEMORANDUM OPINION</u>

I.     JURISDICTION, VENUE, AND STATUTORY AND CONSTITUTIONAL AUTHORITY ..........................3

   A.   Subject Matter Jurisdiction and Venue...................................................................................4

   B.   Statutory Authority ................................................................................................................5

   C.   Constitutional Authority ........................................................................................................7

II.    LEGAL ANALYSIS ........................................................................................................................9

   A.   Count 1: Breach of the DIP Agreement (Brickley v. Scattered) ............................................9

      1.   Scattered's Failure to Fund the Disputed DIP Requests Was Not a Breach of the DIP Agreement. ......10

         a)   The Disputed DIP Requests Were Not Made in Compliance with the DIP Agreement....................10

         b)   At the Time the Disputed DIP Requests Were Made, H&M Was in Default Under the Terms of the DIP Agreement, Thus Excusing Scattered from Funding. .....................................15

      2.   Even if Scattered's Failure to Fund the Disputed DIP Requests was a Breach of the DIP Agreement, the Trustee Failed to Prove Any Resulting Actual or Consequential Damages. ...............19

   B.   Count 4: Breach of Fiduciary Duty (Brickley v. Greenblatt) ...............................................31

      1.   As its Manager, Greenblatt Owed Fiduciary Duties to H&M.....................................................31

      2.   Greenblatt Did Not Breach the Fiduciary Duties He Owed to H&M. .........................................33

         a)   Failure to Timely Pay AFEs Related to Drilling Costs, With No Resulting Harm, Does Not Constitute a Breach of Fiduciary Duty....................................................34

         b)   Greenblatt's Decision Not to Request Funds Under the DIP Agreement to Prepay Completion Costs, Based upon His Interpretation of the JOA, Was Not a Breach of Fiduciary Duty.....................................................36

         c)   Greenblatt's Failure to Take Further Action Against Scattered for Its Alleged Breach of the DIP Agreement Was Not a Breach of Fiduciary Duty.....................................42

      3.   Had Greenblatt Breached the Fiduciary Duties He Owed to H&M, Prospect's Actions Were an Intervening and Superseding Cause of H&M's Alleged Injuries..............................43

   C.   Count 6: Objection to Administrative Wage Claims (Brickley v. Greenblatt)...............................47

   D.   Count 5: Equitable Subordination (Brickley v. Greenblatt) ...............................................51

   E.   Counterclaim: Indemnification Under the LLC Regulations and the DIP Agreement (Greenblatt v. H&M) ...............................................52

      1.   Greenblatt Is Entitled to Indemnification Under the LLC Regulations. ...............................53

      2.   Greenblatt Is Entitled to Indemnification Under the DIP Agreement...............................54

         a)   Greenblatt, in His Capacity as H&M's Manager, Qualifies as an "Indemnitee" Under the Terms of the DIP Agreement. ...............................................55

         b)   The Indemnification Provision Covers the Activities that are the Subject of the Complaint. ...........58

         c)   The Indemnification Provision of the DIP Agreement is Enforceable Under Applicable Law.........60

      3.   Determination of the Amount and Priority of Greenblatt's Claims for Indemnification Under the LLC Regulations and the DIP Agreement. ...............................................64

III.   CONCLUSION...............................................................................................................68

**MEMORANDUM OPINION**

The Court held a trial in this adversary proceeding on June 9-11, 2014. At the conclusion of the trial, the Court directed briefing on several issues raised at trial. The last of the post-trial briefs was submitted on June 17, 2014, following which the Court took the matter under advisement. This Memorandum Opinion contains the Court's findings of fact and conclusions of law pursuant to Federal Rules of Bankruptcy Procedure 7052 and 9014.

## I.  JURISDICTION, VENUE, AND STATUTORY AND CONSTITUTIONAL AUTHORITY[1]

In his Original Complaint [Dkt. No. 1] (the "**Complaint**"), Douglas Brickley, Chapter 7 trustee (the "**Trustee**") of the bankruptcy estate of H&M Oil & Gas, LLC ("**H&M**"), alleged various claims and causes of action against H&M's former Manager, Leon Greenblatt, III ("**Greenblatt**") and H&M's postpetition lender, Scattered Corporation ("**Scattered**"), including: (Count 1) breach of the Court-approved debtor-in-possession financing agreement (the "**DIP Agreement**") [Gr. Ex. H.1] against Scattered;[2] (Count 2) negligence and gross negligence against Scattered; (Count 3) alter ego/control theory against Scattered; (Count 4) breach of fiduciary duty against Greenblatt; (Count 5) equitable subordination of claims against Scattered and Greenblatt; (Count 6) objection to the administrative claim filed by Greenblatt; (Count 7) alter ego against Greenblatt; (Count 8) fraudulent conveyances under 11 U.S.C. § 548 against Scattered and Greenblatt; (Count 9) fraudulent conveyance under 11 U.S.C. § 544 and Texas law against Scattered and Greenblatt; (Count 10) recovery of avoided transfers under 11 U.S.C. § 550 against Scattered and Greenblatt; (Count 11) disallowance of claims under 11 U.S.C.

---

[1] Although no party has challenged this Court's constitutional authority to enter a final judgment in this adversary proceeding, the Court will nonetheless independently analyze its statutory and constitutional authority. To the extent that the District Court disagrees with the parties' and this Court's conclusions that this Court has both statutory and constitutional authority to enter a final judgment, this Memorandum Opinion should be considered proposed findings of fact and conclusions of law.

[2] The order approving the DIP Agreement was entered on July 9, 2012. Order (1) Authorizing Debtors to Incur Postpetition Secured Indebtedness; and (2) Granting Security Interests Pursuant to 11 U.S.C. § 364 (the "**DIP Order**") [Gr. Ex. I.1]. Citations to "Gr. Ex." refers to exhibits entered into evidence by Greenblatt, "Tr. Ex." refers to exhibits entered into evidence by the Trustee, and "Sc. Ex." refers to exhibits entered into evidence by Scattered.

§ 502(d) against Scattered and Greenblatt; and (Count 12) recovery of attorneys' fees against Scattered.  In his Second Amended Answer to Original Complaint and Counterclaim [Dkt. No. 63] (the "**Answer and Counterclaim**"), Greenblatt alleged a counterclaim against the H&M estate for indemnification under the DIP Agreement and H&M's Amended Regulations of Limited Liability Company (the "**LLC Regulations**") [Sc. Ex. B].  Scattered has alleged no counterclaims against the estate.

The majority of these claims were resolved prior to trial through either orders on dispositive motions or by voluntary withdrawal by the Trustee.[3]  As such, the only counts tried by the Court were:  (1) as against Scattered, (Count 1) breach of the DIP Agreement and (Count 12) attorneys' fees;[4] (2) as against Greenblatt, (Count 4) breach of fiduciary duty, (Count 5) equitable subordination, and (Count 6) objection to administrative claim; and (3) as against the estate, Greenblatt's counterclaim for indemnification.

## A.     Subject Matter Jurisdiction and Venue

The U.S. District Court for the Northern District of Texas has subject matter jurisdiction over this adversary proceeding under 28 U.S.C. § 1334.  Although bankruptcy courts do not have independent subject matter jurisdiction over bankruptcy cases and proceedings, 28 U.S.C. § 151 grants bankruptcy courts the power to exercise certain "authority conferred" upon the district

---

[3] *See* Agreed Order on Defendant Scattered Corporation's Motion for Judgment on the Pleadings and Plaintiff's (I) Motion to Strike Defendant Scattered Corporation's Motion for Judgment on the Pleadings, (II) Subject to Plaintiff's Motion to Strike, Plaintiff's Response to Defendant Scattered Corporation's Motion for Judgment on the Pleadings and, in the Alternative, (III) Plaintiff's Motion for Leave to File First Amended Original Complaint [Dkt. No. 20] (dismissing Counts 2 and 8-11 as against Scattered); Order Granting Defendant Scattered Corporation's Motion for Partial Summary Judgment [Dkt. No. 116] (granting summary judgment on Counts 3 and 5 as against Scattered); and Order Granting in Part and Denying in Part Leon A. Greenblatt, III's Motion for Partial Summary Judgment [Dkt. No. 161] (noting the Trustee's withdrawal of Counts 8 and 9 as against Greenblatt, which mooted Counts 10 and 11 as against Greenblatt, granting summary judgment on Counts 7 and 12 as against Greenblatt, and granting partial summary judgment on Count 4 of the Complaint as it relates to the Trustee's allegations for punitive damages as against Greenblatt and allegations that Greenblatt received any personal benefit from his alleged breaches of fiduciary duty).

[4] As discussed in § II.A.1, *infra*, the Court finds that the Trustee failed to carry his burden on Count 1 (breach of the DIP Agreement).  This Memorandum Opinion does not address Count 12, the related count for attorneys' fees, since the Trustee's claim for attorneys' fees depended upon the Trustee prevailing on Count 1.

courts by title 28. Under 28 U.S.C. § 157, the district courts may refer bankruptcy cases and proceedings to the bankruptcy courts for either entry of a final judgment (core proceedings) or proposed findings and conclusions (noncore, related-to proceedings). So, as relevant here, this Court exercises jurisdiction over the debtor's underlying Chapter 7 bankruptcy case and this adversary proceeding pursuant to the Order of Reference of Bankruptcy Cases and Proceedings Nunc Pro Tunc adopted in this district on August 3, 1984 (the "**Standing Order of Reference**"). Venue is proper here under 28 U.S.C. § 1409.

###### B.      Statutory Authority

Section 1334(b) lists three types of proceedings over which the district court has jurisdiction – those "arising under title 11," those "arising in" a case under title 11, and those "related to" a case under title 11. 28 U.S.C. § 1334(b). The classification of a proceeding under § 1334 depends on the connection of the proceeding to the bankruptcy case. "Arising under" jurisdiction involves "causes of action created or determined by a statutory provision of title 11." *Faulkner v. Eagle View Capital Mgt. (In re The Heritage Org., L.L.C.),* 454 B.R. 353, 360 (Bankr. N.D. Tex. 2011) (citing *Wood v. Wood (In re Wood)*, 825 F.2d 90, 96 (5th Cir. 1987)). "Arising in" jurisdiction is "not based on a right expressly created by title 11, but is based on claims that have no existence outside of bankruptcy." *Faulkner*, 454 B.R. at 360 (citing *Wood*, 825 F.2d at 97). "Arising under" and "arising in" proceedings are "core" proceedings. 28 U.S.C. § 157(b)(1); *Stern v. Marshall,* 131 S. Ct. 2594, 2605 (2011); *U.S. Brass Corp. v. Travelers Ins. Grp., Inc. (In re U.S. Brass Corp.),* 301 F.3d 296, 304 (5th Cir. 2002).

In comparison, "related to" jurisdiction exists if "the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy." *Celotex Corp. v. Edwards,* 514 U.S. 300, 308 n.6 (1995) (quoting *Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984)); *U.S. Brass*, 301 F.3d at 304. "That state law may affect a proceeding's resolution

cannot be the sole basis by which a proceeding is excluded from the otherwise large net cast by 'related to' jurisdiction." *Hartley v. Wells Fargo Bank, N.A. (In re Talsma)*, 509 B.R. 535, 542 (Bankr. N.D. Tex. 2014) (citing 28 U.S.C. § 157(b)(3)). Proceedings that involve merely "related to" jurisdiction and do not otherwise arise under the Bankruptcy Code or arise in a bankruptcy case are "non-core." *Faulkner*, 454 B.R. at 360.

A bankruptcy judge's authority in cases and proceedings differs depending on whether the subject matter is "core" or "non-core." 28 U.S.C. § 157(b)-(c). A bankruptcy court may hear and determine (*i.e.,* enter a final order in) all cases filed under title 11 and all proceedings within a bankruptcy court's "core" authority. *Id*. § 157(b)(1). Section 157(b)(2) provides a non-exclusive list of such core proceedings. *Id*. § 157(b)(2). In non-core proceedings, the statute limits the bankruptcy court to issuing proposed findings of fact and conclusions of law to the district court, *id*. § 157(c)(1), unless the parties consent to the bankruptcy court's issuance of a final judgment, *id.* § 157(c)(2).

With this framework in mind, the Court now returns to the claims and counterclaim at issue in this adversary proceeding. First, the Court concludes that the claims by and among the Trustee and Greenblatt are each core. Specifically, the Trustee's objection to the administrative claim filed by Greenblatt (Count 6) is core under 28 U.S.C. § 157(b)(2)(B), and his request for equitable subordination of such claim (Count 5) is a matter arising under 11 U.S.C. § 510(c). Similarly, the Trustee's allegations regarding Greenblatt's actions (or inactions) as H&M's postpetition Manager, as well as Greenblatt's related claim for indemnification, are core because they arise in and are inextricably linked to the Court-approved DIP Agreement, which was an integral part of H&M's Chapter 11 bankruptcy case. As such, the Court has statutory authority

to hear and finally determine Counts 4-6 of the Complaint, as well as Greenblatt's counterclaim for indemnification against the estate.

Second, Count 1 of the Complaint, alleging that Scattered breached the Court-approved DIP Agreement, is core under 28 U.S.C. § 157(b)(2)(O). Further, this claim arises under the Bankruptcy Code and the statutory framework governing a debtor-in-possession's ability to obtain postpetition financing. Alternatively, the claim arises in a case under title 11 because, although breach of contract claims exist outside of bankruptcy, a breach of the DIP Agreement would not exist independent of H&M's bankruptcy case and this Court's entry of the DIP Order.

The Court's analysis of its authority, however, does not end here. Now that the Court has determined that it has statutory authority to finally adjudicate the claims and counterclaim, it must determine whether it also has constitutional authority.

### C.    Constitutional Authority

In *Stern v. Marshall,* 131 S. Ct. 2594 (2011), the U.S. Supreme Court held that, notwithstanding the bankruptcy court's statutory authority under 28 U.S.C. § 157(b)(2)(C) to adjudicate an estate's counterclaim against a creditor, the bankruptcy court lacked constitutional authority to enter a final judgment on the state-law counterclaim because such claim would "not [be] resolved in the process of ruling on a creditor's proof of claim." *Id.* at 2620; *see also BP RE, L.P. v. RML Waxahachie Dodge, L.L.C.,* 735 F.3d 279, 286 (5th Cir. 2013) ("Thus, 'Congress may not bypass Article III simply because a proceeding may have *some* bearing on a bankruptcy case; the question is whether the action at issue stems from the bankruptcy itself or would necessarily be resolved in the claims allowance process.'") (citing *Stern*, 131 S. Ct. at 2618); *Frazin v. Haynes & Boone, LLP (In re Frazin),* 732 F.3d 313, 317-20 (5th Cir. 2013) (concluding that two of three counterclaims would necessarily be resolved in the bankruptcy

court's award of attorneys' fees and were therefore within the bankruptcy court's constitutional authority under *Stern*).

Here, the Trustee's claims against Greenblatt, as well as Greenblatt's counterclaim for indemnification, each center around Greenblatt's actions allegedly taken (or not taken) in his postpetition role as H&M's Manager. Greenblatt's actions as postpetition Manager of H&M are also the subject of the $42,000 administrative claim Greenblatt filed against the H&M estate. *See* Administrative Priority Expense Proof of Claim [Gr. Ex. X.1] at ¶¶ 2,4 (the "**Greenblatt Wage Claim**") ("The Debtor owed me monies for wages, which accrued during the pendency of the above-captioned bankruptcy case at a rate of Six Thousand Dollars ($6,000) per month. … The wages owing to me arise as a result of services that I provided to the Debtor in my role as the Debtor's Manager."). Thus, this Court concludes that it has the constitutional authority to enter a final judgment on the Trustee's claims against Greenblatt (Counts 4-6), as well as Greenblatt's counterclaim for indemnification, as these claims would "necessarily be resolved in the claims allowance process" or "stem[] from the bankruptcy itself." *BP RE,* 735 F.3d at 286 (citing *Stern*, 131 S. Ct. at 2618)); *The Cadle Co. v. Moore (In re Moore)*, 739 F.3d 724, 728 (5th Cir. 2014).

The Trustee's claims against Scattered (although based on state law) relate to the conduct of the parties under the DIP Agreement during the pendency of H&M's Chapter 11 bankruptcy case. If not for the bankruptcy and this Court's entry of the DIP Order, the Trustee's claim for Scattered's alleged breach of the DIP Agreement would not exist. Therefore, the Court concludes that it has constitutional authority to enter a final judgment on Count 1 of the Complaint (breach of the DIP Agreement) because the claim "stems from the bankruptcy itself," *Stern*, 131 S. Ct. at 2618, and "relate[s] entirely to matters integral to the bankruptcy case." *See*

*Miller v. Greenwich Capital Fin. Prods., Inc. (In re Am. Bus. Fin. Servs., Inc.),* 471 B.R. 354,

362 (Bankr. D. Del. 2012) (finding constitutional authority to enter a final order on, among other

claims, breach by a lender of a debtor-in-possession financing agreement).

## II.     LEGAL ANALYSIS

As noted previously, the claims and counterclaim remaining for trial were:  (1) as against

Scattered, Count 1 (breach of the DIP Agreement) and Count 12 (attorneys' fees); (2) as against

Greenblatt, Count 4 (breach of fiduciary duty), Count 5 (equitable subordination), and Count 6

(objection to administrative claim); and (3) as against the estate, Greenblatt's counterclaim for

indemnification under the LLC Regulations and the DIP Agreement.  As detailed below, the

Court finds and concludes that the Trustee has failed to carry his burden of proof on all counts

and shall take nothing by his Complaint.  Greenblatt is entitled to a judgment on his counterclaim

for indemnification under the DIP Agreement in the amount of $420,145 in attorneys' fees and

$28,831.40 in related expenses, plus the following amounts should the Trustee appeal the

judgment to be entered in accordance with this Memorandum Opinion:  (1) $30,000 for post-trial

motions before this Court, (2) $35,000 for an appeal to the district court, (3) $25,000 for an

appeal to the Fifth Circuit, (4) $25,000 for an application for writ of certiorari to the U.S.

Supreme Court, and (5) $15,000 if that writ is granted, which will be allowed as an

administrative expense claim against H&M's Chapter 11 estate.  Alternatively, if this Court erred

in allowing Greenblatt's indemnification claim under the DIP Agreement, Greenblatt is entitled

to a judgment in the same amounts on his counterclaim for indemnification under the LLC

Regulations, which will be allowed as a general unsecured claim.

### A.     Count 1: Breach of the DIP Agreement (Brickley v. Scattered)

"To prevail on a claim for breach of contract, the plaintiff must establish the following

elements:  (1) the existence of a valid contract; (2) performance or tendered performance by the

plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach." *S. Elec. Servs., Inc. v. City of Houston*, 355 S.W.3d 319, 323-24 (Tex. App. – Houston [1st Dist.] 2011, pet. denied).

Here, the parties do not dispute that the DIP Agreement was an existing and valid contract, so the Court will focus its analysis on the remaining elements. For the reasons set forth below, the Court finds that the Trustee failed to carry his burden of proof and, as such, his breach of contract claim against Scattered fails.

> **1.    Scattered's Failure to Fund the Disputed DIP Requests Was Not a Breach of the DIP Agreement.**

The Trustee alleges that H&M performed all of its obligation under the DIP Agreement, including being in compliance with all material terms of the agreement and making proper borrowing requests. According to the Trustee, Scattered then breached the DIP Agreement by failing to fund two borrowing requests: (1) a request in the amount of $925,000 made on October 4, 2012 (Gr. Ex. V.2), and (2) a request in the amount of $350,000 made on October 18, 2012 (Gr. Ex. V.3) (together, the "**Disputed DIP Requests**"). Scattered counters by arguing that the Disputed DIP Requests were not made in compliance with the DIP Agreement and, in any event, H&M was in default under the DIP Agreement when the Disputed DIP Requests were made, thus excusing Scattered from its obligation to fund. As discussed below, the Court agrees with Scattered on both points.

> **a)    The Disputed DIP Requests Were Not Made in Compliance with the DIP Agreement.**

As explained in more detail below, the Court finds that neither of the Disputed DIP Requests was made in compliance with the DIP Agreement. Specifically, § 2.2 of the DIP Agreement states that:

> H&M may request an Advance hereunder by giving the Lender a borrowing request no later than 2:00 p.m. (prevailing Central Time), one Business Day before the date of the proposed Advance.  Each Borrowing Request shall specify the following information:
>
> (a) the principal amount of the requested Advance; and
>
> (b) the proposed date for making of such Advance, which shall be a Business Day.

DIP Agreement [Gr. Ex. H.1] at § 2.2.  Thus, to be proper, a draw request must (1) be made by H&M, (2) state the principal amount of the requested advance, and (3) state the proposed funding date.[5]  In light of these requirements, the Court will address the Disputed DIP Requests in reverse chronological order.

The $350,000 Disputed DIP Request was submitted by David Jones ("**Jones**"),[6] purportedly on H&M's behalf.  The request states the principal amount of the requested advance ($350,000), but does not give the proposed funding date.  DIP Draw Request [Gr. Ex. V.3] at 002294.  Because the $350,000 Disputed DIP Request does not contain the information expressly required by § 2.2(b) of the DIP Agreement, Scattered was not required to fund the request pursuant to the plain language of the DIP Agreement and its failure to fund was not a breach of that agreement.

The $925,000 Disputed DIP Request was also submitted by Jones, but with the signature block of "H&M Resources, LLC," not H&M.  DIP Draw Request [Gr. Ex. V.2] at 001833.  Although this request does give the principal amount of the requested advance ($925,000) and

---

[5] The Court notes that the first and second draw requests under the DIP Agreement (Gr. Exs. Q.2 and S.2, respectively) also do not appear to comply with the terms of § 2.2 of the DIP Agreement.  However, § 8.3 of the DIP Agreement contains an anti-waiver clause, which states that "[n]o failure or delay by Lender in exercising any right or power hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power."

[6] Greenblatt hired Jones to run H&M's oil and gas operations.  Although it is unclear in the record whether Jones was employed by H&M or H&M's non-debtor subsidiary H&M Resources, LLC ("**H&M Resources**"), or both, it is undisputed that Jones was not a manager of H&M.  JPTO [Dkt. No. 144] at 12, ¶ 35.

the proposed funding date (October 5, 2012), it was not submitted by H&M and, thus, does not comply with the express requirements of § 2.2 of the DIP Agreement. Because Jones was in charge of drilling operations for H&M Resources, which is H&M's wholly-owned subsidiary, the Court recognizes the technicality of this finding. However, the DIP Agreement clearly dictates what is required to make a proper funding request, including that a request may only be made by H&M, which did not occur here. Thus, Scattered was not required to fund the request pursuant to the plain language of the DIP Agreement and its failure to fund was not a breach of that agreement.

Moreover, even if Jones's use of H&M Resources' signature block was an oversight, there is also a dispute regarding whether Jones had authority to request advances under the DIP Agreement on H&M's behalf, to which the Court will now turn. To determine whether Jones had authority to request funds under the DIP Agreement on H&M's behalf, the Court will first consider the LLC Regulations. Section 8.01 of the LLC Regulations states that "the Manager (hereinafter designated) [Greenblatt] shall have the sole and exclusive right to manage the business of the Company [H&M], including, without limitation, the right and power to: … (c) execute any and all agreements … and instruments necessary or convenient in connection with the management, maintenance and operation of Company property; (d) borrow money …." LLC Regulations [Sc. Ex. B] at § 8.01(d). Section 8.05, in turn, permits the Manager to employ "such agents, attorneys and employees as he deems appropriate" and to "delegate or assign to such agents, attorneys and employees such duties and responsibilities…described in Section 8.01 or otherwise, as the Manager may deem appropriate or necessary." *Id.* at §8.05. Under the LLC Regulations, it is clear that Greenblatt, as Manager, had sole authority to make draw requests

under the DIP Agreement on H&M's behalf, unless he delegated his authority to Jones. As discussed below, there is insufficient evidence in the record to find such a delegation occurred.

The issue surrounding Jones's authority to request funds under the DIP Agreement appears to arise from the fact that Greenblatt concurrently served as both H&M's Manager and an officer of Scattered. As such, at trial, the parties propounded their respective positions regarding whether "official" draw requests went directly from Jones to Greenblatt, as an officer of Scattered, or from Jones to Greenblatt, as H&M's Manager, who then determined when/if to forward the request to Scattered. If the former, the Trustee has a better argument that the $925,000 Disputed Draw Request was valid.

At trial, Greenblatt testified that, as H&M's Manager, he was the only party with authority to request funds under the DIP Agreement and that he did not delegate that authority to Jones, nor would he delegate the authority to borrow money on behalf of H&M to any employee or agent. According to Greenblatt, Jones would send requests for advances under the DIP Agreement to him, in his capacity as H&M's Manager, and he would then determine whether to forward the requests to Scattered.

The Trustee's counsel, however, argued that Jones had authority to request funds under the DIP Agreement and would send requests to Greenblatt in his capacity as an officer of Scattered. Indeed, the Trustee somewhat impeached Greenblatt's testimony on this point with prior deposition testimony in which Greenblatt stated that Jones was authorized to make funding requests to Scattered under the DIP Agreement. Scattered, however, rehabilitated Greenblatt's testimony by reference to multiple other instances within the same deposition where Greenblatt stated his belief that Jones was forwarding the requests to him in his capacity as H&M's Manager, not as Scattered's officer.

Jones's own testimony regarding his actions did nothing to clarify the issue. While on the witness stand, Jones testified that he believed that he had authority to request funds directly from Scattered on H&M's behalf because Greenblatt never told him that he could not. Jones, however, could not recall any conversion with Greenblatt in which Greenblatt expressly authorized him to request funds on H&M's behalf. Further, when questioned regarding his belief as to Greenblatt's capacity in receiving the Disputed DIP Requests, Jones testified that he gave no consideration to which capacity Greenblatt served when he sent emails requesting funds under the DIP Agreement. And, although Jones cc'ed Scattered's counsel on the Disputed DIP Requests, Jones further testified that he cc'ed attorneys on the emails without considering whether the attorneys represented H&M or Scattered. By the conclusion of trial, the evidence amounted to Greenblatt, on the one hand, stating that he did not delegate authority to request funds under the DIP Agreement to Jones, and Jones, on the other hand, stating his belief that he had authority because Greenblatt never told him otherwise.

Jones's personal belief in his authority, without more, is insufficient to prove he had authority to request funds directly from Scattered under the DIP Agreement. Indeed, under Texas law, agency or the scope of authority cannot be proven by the statements of the purported agent alone. *Valley Ranch Dev. Co., Ltd. v. F.D.I.C.*, 960 F.2d 550, 553 (5th Cir. 1992) (citing *Claus v. Gyorkey*, 674 F.2d 427, 434 n.7 (5th Cir. 1982)). As such, Jones could not create authority via his personal beliefs; instead, the operative acts are those attributable to Greenblatt. And, as both Jones and Greenblatt testified, Greenblatt did not expressly confer on Jones the authority to request funds under the DIP Agreement. Moreover, Greenblatt did more than just blindly forward Jones's funding requests to Scattered. In fact, the record shows that the second request for funds under the DIP Agreement initiated by Jones and sent to Greenblatt was for

$500,000. DIP Request Email [Gr. Ex. R.2] at 001835. As Greenblatt testified, however, he reduced the request to $400,000 to reflect the correct amount, as discussed between Jones and Greenblatt, prior to forwarding the request to Scattered, who ultimately funded the $400,000.

After carefully considering the evidence, the Court finds that Jones did not have authority to request funds under the DIP Agreement on H&M's behalf. As such, the Disputed DIP Requests did not comply with the terms of § 2.2 of the DIP Agreement, and Scattered was not obligated to fund.

> **b)** **At the Time the Disputed DIP Requests Were Made, H&M Was in Default Under the Terms of the DIP Agreement, Thus Excusing Scattered from Funding.**

The Court finds that, even if the Disputed DIP Requests were made in accordance with the DIP Agreement, an "Event of Default" had occurred under the DIP Agreement, thus excusing Scattered from funding the requests, as the Court will now explain. Article VII of the DIP Agreement defines what constitutes an "Event of Default" under the agreement. Particularly, § 7.1 states:

> 7.1 If any of the following events ("Events of Default") shall occur:
>
> (m) the bringing of a motion, **taking of any action** or the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto **by one or both of the Debtors** in its chapter 11 case or the Chapter 11 Cases: (1) to obtain additional financing under § 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (ii) to grant any Lien on the Collateral; (iii) to use cash collateral under § 363(c) of the Bankruptcy Code without the prior written consent of the Lender; or (iv) **any other action or actions adverse to the Lender or its rights and remedies hereunder or its interest in the Collateral**.

DIP Agreement [Gr. Ex. H.1] at §7.1(m) (emphasis added).

Scattered relies upon § 7.1(m)(iv) to argue that H&M's called default under the Second Interim Agreed Order Granting (I) Debtor's Motion for Order Authorizing Use of Cash Collateral, (II) Granting Adequate Protection to the Prepetition Secured Lender, (III) Scheduling

a Subsequent Hearing and (IV) Granting Related Relief (the "**Second Interim Cash Collateral Order**") [Gr. Ex. K.1], which resulted in H&M's inability to use cash collateral, resulted in a corresponding event of default under the DIP Agreement. Additional background is needed to place this argument into context.

Under the Second Interim Cash Collateral Order, upon an event of default, H&M's right to use cash collateral would terminate automatically three business days after receiving a notice of default from its prepetition secured lender, Prospect Capital Corporation ("**Prospect**"). Joint Pretrial Order [Dkt. No. 144] (the "**JPTO**") at 12, ¶ 33; Second Interim Cash Collateral Order [Gr. Ex. K.1] at ¶ 11(b). On October 5, 2012, Prospect sent an email to H&M informing it that Prospect considered an election made by Hibernia Resources, LLC ("**Hibernia Resources**")[7] to treat H&M as a non-consenting party on well DF 319 A #5 a default under the Second Interim Cash Collateral Order. JPTO [Dkt. No. 144] at 12, ¶ 38. Prospect followed this email with a formal notice of default dated October 9, 2012. Prospect Default Letter [Gr. Ex. L.3] at 1 ("[H&M's] failure to pay [Hibernia Resources] pursuant to that certain AFE … dated October 4, 2012, constitutes an event of default under paragraph 11 of the [Second Interim] Cash Collateral Order."). Thus, H&M's authority to use cash collateral automatically terminated on October 12, 2012.[8]

Under § 4.2 of the DIP Agreement, a condition precedent to each advance was that "at the time of and immediately after giving effect to such Advance, no Default or Event of Default shall have occurred and be continuing…." DIP Agreement [Gr. Ex. H.1] at § 4.2(d). Scattered argues that H&M's called default under the Second Interim Cash Collateral Order triggered

---

[7] Hibernia Resources acted as operator under a Joint Operating Agreement to which H&M was a party.

[8] The Court notes that Prospect sent an email to H&M on September 6, 2012 [Gr. Ex. M.2] advising H&M of a default under the Second Interim Cash Collateral Order; however, the record shows H&M continued to use Prospect's cash collateral without objection.

§§ 7.2(m)(iv) and 4.2 of the DIP Agreement and, thus, Scattered's obligation to fund the Disputed DIP Requests never arose.

In response, the Trustee argues that § 7.2(m)(iv) of the DIP Agreement was not triggered because it specifically requires "the bringing of a motion, taking of any action or the filing of any plan of reorganization or liquidation or disclosure statement attendant thereto," none of which occurred here. Further, according to the Trustee, H&M's called default under the Second Interim Cash Collateral Order, and corresponding alleged default under the DIP Agreement, arose not from an action but from inaction, *i.e.,* H&M's failure to pay Hibernia Resources for completion costs.

Under the plain language of the DIP Agreement, to trigger a default under § 7.1(m)(iv) H&M must have taken an "action" and such action must have been "adverse" to Scattered or its rights and remedies under the DIP Agreement or its interest in its collateral. The Court will address these two requirements in turn.

First, Greenblatt, on H&M's behalf and as its Manager, interpreted the payment terms of the Joint Operating Agreement (the "**JOA**")[9] and consciously decided not to prepay Hibernia Resources for the completion costs, thus triggering Prospect's decision to call a default under the Second Interim Cash Collateral Order that lead to Scattered declaring a default under the DIP Agreement. The Court finds that Greenblatt's acts, as H&M's Manager, constitute "actions" under the terms of § 7.1(m).

Second, H&M's actions in this regard were adverse to Scattered. As stated in the DIP Order:

---

[9] The Court entered an order on September 10, 2012 granting H&M's request to assume the JOA. *See* Order Granting First Amended Motion to Assume Executory Contract Pursuant to 11 U.S.C. § 365(d)(2) [Gr. Ex. L.1]. This order modified the terms of the JOA so that Greenblatt Exhibits A.1 (JOA) and B.1 (Ratification and Amendment of Operating Agreement), combined, represent a complete copy of the JOA, as assumed.

**MEMORANDUM OPINION** 17

> H&M, having advised the Court that it intends to undertake a drilling program to increase the value of its bankruptcy estate, does not have sufficient available sources of working capital or cash to operate its business without the proposed DIP Financing from [Scattered]. Similarly, Anglo-American,[10] which is a holding company and owner of H&M, does not have sufficient available sources of working capital or cash to provide to H&M to allow H&M to operate its business without the proposed DIP Financing from [Scattered]. The ability of the Debtors to immediately obtain sufficient working capital and liquidity through the DIP Financing is vital to the preservation and maximization of the value of the Debtors' assets and properties, and in particular, to the Debtors' ability to successfully implement any plan of reorganization. Given the need to undertake drilling to maintain lease rights, absent the granting of relief as requested herein, the Debtors and their estates will suffer immediate and irreparable harm.

DIP Order [Gr. Ex. I.1] at ¶ F. Further, as reflected in H&M's budget associated with the DIP Order, H&M's predominant sources of cash were Prospect's cash collateral, which was the subject of the Second Interim Cash Collateral Order, and advances under the DIP Agreement. *See* H&M Oil & Gas, LLC Operating Budget [Tr. Ex. 7] (the "**DIP Budget**"). Indeed, during the six-month period of the DIP Budget, H&M anticipated an aggregate of $16,300,874 in "Total Available Cash," with draws under the DIP Agreement representing only $4,950,000 of this amount.

As such, (1) without access to cash collateral, H&M had insufficient funds to pay its day-to-day operating expenses and continue its drilling programs; (2) use of cash collateral and advances under the DIP Agreement were intertwined and both were necessary to keep H&M afloat and permit it to continue its drilling operations, including maintaining its interests in the wells and the underlying property that served as Scattered's collateral; and (3) H&M's conscious decision to not pay Authority for Expenditures ("**AFEs**") issued by Hibernia Resources for completion costs was an action adverse to Scattered and its interests in its collateral[11] that

---

[10] "Anglo America" refers to Anglo-American Petroleum Corp., H&M's sole member. LLC Regulations [Sc. Ex. B] at 1.

[11] Although the Court later finds that (1) H&M's decision to not pay the AFEs was proper under the JOA, and (2) Hibernia Resources did not have a right to issue the Notice(s) of Non-Consent under the JOA, *see* § II.B.2.b), *infra*,

triggered a default under § 7.1(m)(iv) of the DIP Agreement and relieved Scattered of its obligation to fund the Disputed DIP Requests.

> **2. Even if Scattered's Failure to Fund the Disputed DIP Requests was a Breach of the DIP Agreement, the Trustee Failed to Prove Any Resulting Actual or Consequential Damages.**

Even though the Court finds that Scattered did not breach the DIP Agreement, it will nonetheless analyze the Trustee's alleged damages. In this regard, Scattered argues that (1) the Trustee failed to prove any actual or consequential damages arising from the alleged breach, and (2) H&M waived its ability to seek consequential damages under § 8.4(c) of DIP Agreement. The Court will address these arguments in turn.

The Court finds Scattered's initial argument regarding damages persuasive. Even if this Court were to find that Scattered's failure to fund the Disputed DIP Requests was a breach of the DIP Agreement, the Trustee failed to prove any resulting damages.[12] Without proof of damages, the Trustee's claim for breach of contract fails. *See, e.g., S. Elec. Servs., Inc.*, 355 S.W.3d at 323-24 (Tex. App. – Houston [1st Dist.] 2011, pet. denied) (listing damages as an element of a breach of contract claim).

In a breach of contract action, damages may be broken into one of two categories: actual (direct) damages or consequential damages. The Texas Supreme Court has held that "[i]n an action for breach of contract, actual damages may be recovered when the loss is the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Group,*

---

H&M's action was nevertheless adverse to Scattered due to the fact that Prospect decided to call a default under the Second Interim Cash Collateral Order and H&M lost the right to use Prospect's cash collateral. Prospect called the default based upon Hibernia Resources issuing the Notice(s) of Non-Consent, which was caused by H&M deciding not to pay AFEs requesting prepayment of completion costs. *See* Gr. Exs. L.3 (Prospect Default Letter) and T.2 (Notice of Non-Consent).

[12] Prior to trial, and after a full evidentiary hearing, the Court issued its Memorandum Opinion and Order [Dkt. No. 162] in which it granted the Defendants' respective motions to exclude the expert testimony of John Bittner, the Trustee's only proposed expert on damages arising from Scattered's alleged breach of contract, on the ground that that the Trustee failed to meet his burden to prove that the testimony and report were reliable under the standards of Federal Rules of Evidence 702 and 703.

*Inc.,* 615 S.W.2d 685, 687 (Tex. 1981). "Direct damages are the necessary and usual result of the defendant's wrongful act; they flow naturally and necessarily from the wrong." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 816 (Tex. 1997). On the other hand, consequential damages are damages that occur naturally, but do not necessarily stem from the breach. *Id.*; *RAJ Partners, Ltd. v. Darco Const. Corp.*, 217 S.W.3d 638, 647 (Tex. App. – Amarillo 2006, no pet.). Moreover, consequential damages are not recoverable unless the damages were foreseeable. *Arthur Andersen*, 945 S.W.2d at 816; *Mead*, 615 S.W.2d at 687. Accordingly, in order to recover consequential damages, the damages must have been foreseeable by the parties, directly traced to the breach, and result from the breach. *See Mead*, 615 S.W.2d at 687.

More specifically, "the basic common law measure of damage for breach of a loan agreement is the difference between the contractual rate of interest and the rate of interest that the borrower is required to pay to obtain the money from another source; however, special or consequential damages reasonably within the contemplation of the parties at the time of the agreement may also be recovered." *Tex. Commerce Bank Reagan v. Lebco Constr., Inc.*, 865 S.W.2d 68, 74 n.2 (Tex. App. – Corpus Christi 1993, writ denied), *overruled on other grounds, John & Higgins of Tex., Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507 (Tex. 1998) (citations omitted); *see also Basic Capital Mgmt. Inc. v. Dynex Commercial Inc.,* 402 S.W.3d 257, 264-65 (Tex. App. – Dallas 2013, pet. denied) (analyzing direct and consequential damages in a failure-to-lend context). "To be liable for the consequential damages resulting from a breach of a loan commitment, the lender must have known, at the time the commitment was made, the nature of the borrower's intended use of the loan proceeds but [need] not [know] the details of the intended

venture." *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 903 (Tex. 2011).

Here, however, the Trustee argues that, due to the unique nature of this transaction, the general rules governing damages in failure-to-lend cases should not govern because: (1) the contract at issue is not a standard loan agreement, but rather is a debtor-in-possession loan agreement that was approved by this Court and is an integral part of H&M's bankruptcy proceeding; (2) the terms of the loan – *i.e.,* a second lien position – cannot be replicated in the marketplace, so there is no "replacement" loan against which to measure direct damages; (3) H&M is an oil and gas company and, as such, calculating consequential damages is not as straight forward as it would be in other industries; and (4) there is "significant" evidence of lost value. Plaintiff Douglas J. Brickley's Post-Trial Brief [Dkt. No. 172] ("**Trustee's Post-Trial Brief**") at ¶ 3. The "significant" evidence of lost value, as alleged by the Trustee, is generally comprised of the following: (1) as Scattered was aware, H&M intended to use the funds advanced to it under the DIP Agreement to assist it in undertaking a program to drill three additional wells; (2) it is undisputed that H&M would not seek to drill additional wells, nor would Scattered provide financing for additional wells, unless each believed that the wells would increase the value of the estate; (3) the average cost for H&M to drill a well was approximately $2 million per well, so the total cost of the drilling program would be approximately $6 million; and (4) "[w]ithout question, this Court can infer that it was more likely than not that if the Debtor had drilled three wells, it was highly unlikely that all three wells would have been unsuccessful;" thus, according to the Trustee, the Court may determine some loss to the estate from the presumed success of the drilling program "which value could at least be defined as $6.0M, plus some integral amount." *Id.* at ¶ 3.

From the Court's perspective, the Trustee has alleged multiple, alternative measures of damages[13] arising from Scattered's alleged breach of the DIP Agreement, including that H&M suffered damages:  (1) of $7.2 million, representing the outstanding availability under the DIP Agreement when the alleged breach occurred, or at least $925,000, representing the amount of the first Disputed DIP Request; (2) in an amount that equates to lost profits, *i.e.,* an amount that the Court believes represents loss to the estate based on the presumed success of the drilling program; (3) the incurrence of $335,526.91 in attorneys' fees and expenses related to (i) H&M's dispute with Hibernia over prepayment of well completion costs, (ii) the litigation surrounding the appointment of the Trustee, and (iii) the costs of the Trustee and his professionals in H&M's Chapter 11 case;[14] (4) $100,000 related to the Trustee's settlement payment to Hibernia regarding the prepayment of well completion costs; and (5) damages associated with H&M's inability to complete the drilling program and reorganize for the benefit of creditors.  *See* Trustee's Pre-Trial Brief at ¶ 13; Trustee's Post-Trial Brief [Dkt. No. 172] at ¶ 9.[15]  As explained below, however, the Trustee has failed to carry his burden of proof as to each alleged measure of damages.

As an initial matter, it is undisputed that, once Scattered's alleged breach of the DIP Agreement occurred, H&M did not obtain an alternative loan.  Although the Court appreciates the unique nature of Scattered's agreement to lend on a fully subordinated basis to Prospect's first lien position, and the arguable unavailability of a loan on substantially similar terms from a

---

[13] In his pretrial brief, the Trustee also requests $14.2 million for "loss of value" damages.  These damages were the subject of an expert report authored by John Bittner, which was excluded from trial.  *See* Memorandum Opinion [Dkt. No. 162].  As such, this measure of damage will not be addressed  by the Court in this Memorandum Opinion.

[14] H&M's case was converted from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code on June 5, 2013.  JPTO at 11, ¶ 4.

[15] The Court could find no evidence in the record supporting the Trustee's last alleged measure of alleged damages.  As such, it will not be addressed further in this Memorandum Opinion.

**MEMORANDUM OPINION**                                                                 22

third party,[16] H&M's failure to obtain replacement financing leaves this Court with no evidence upon which it could award actual damages in the form of increased costs of lending. Moreover, the Trustee cites to no authority for his argument that the general rules governing the award of damages in a failure to lend case, like this one, should not apply. Nor could the Court find any authority to support the Trustee's argument. As such, the Court's analysis will focus on the availability of special or consequential damages in the form of (1) lost profits, (2) outstanding availability under the DIP Agreement, and (3) fees and expenses arising in the underlying bankruptcy case.

With respect to the proper measure for calculating lost profits, the Supreme Court of Texas has explained that:

> [r]ecovery for lost profits does not require that the loss be susceptible of exact calculation. *White v. Southwestern Bell Tel. Co.,* 651 S.W.2d 260, 262 (Tex. 1983); *Southwest Battery Corp. v. Owen*, 131 Tex. 423, 115 S.W.2d 1097, 1098 (1938). However, the injured party must do more than show that they suffered some lost profits. The amount of the loss must be shown by competent evidence with reasonable certainty. *White*, 651 S.W.2d at 262; *Southwest Battery*, 115 S.W.2d at 1098. What constitutes reasonably certain evidence of lost profits is a fact intensive determination. **At a minimum, opinions or estimates of lost profits must be based on objective facts, figures, or data from which the amount of lost profits can be ascertained**.

*Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992) (emphasis added) (citations omitted); *see also Basic Mgmt., Inc.*, 402 S.W.3d at 267-68 (applying the standard for lost profits propounded in *Holt Atherton* in the context of an alleged breach-of-loan-commitment claim).

Here, notably missing from the evidentiary record is any factual basis upon which this Court may calculate the "integral amount" that the Trustee alleges represents lost profits related to the anticipated drilling program. Indeed, when pressed by the Court during closing argument at trial, the Trustee's counsel could not quantify this amount or provide the Court with figures it

---

[16] There is no evidence in the record that the Trustee ever attempted to obtain alternative funding.

could use to quantify this amount. Without some form of objective, non-speculative evidence (such as credible evidence regarding the probability of a successful drilling program in the relevant fields, historical profits generated per well in the relevant fields, etc.), there is nothing in the record upon which this Court could base its calculation. *See, e.g., Burkhart Grob Luft Und Raumfahrt GmbH & Co. KG v. E–Systems, Inc.,* 257 F.3d 461, 467 (5th Cir. 2001) ("A plaintiff's failure to show either the existence or amount of lost profits will necessarily prevent their recovery."); *Tex. Instruments, Inc. v. Teletron Energy Mgmt., Inc*., 877 S.W.2d 276, 280 (Tex. 1994) (holding there was no evidence to prove lost profits with reasonable certainty because there was no history of profits and, even though there was evidence of a market, the viability of the product was in doubt because it was a new product that had not yet been created); *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C*., 207 S.W.3d 801, 824 (Tex. App. – Houston [14th Dist.] 2006, pet. denied) ("The fervent hope of Brickhill and Schaefer for Plaintiffs' success in obtaining financing, buying the Kazakhtenge interests, and producing and marketing oil and gas from the Tenge Field under Schaefer's production plan is not enough to warrant recovery of lost profits."). *See also Miga v. Jensen,* 96 S.W.3d 207, 216–17 (Tex. 2002) (stating that contract damages should not put plaintiff in a better position than if the contract had been honored by giving the plaintiff a risk-free investment); *Reardon v. LightPath Techs., Inc.,* 183 S.W.3d 429, 442 (Tex. App. – Houston [14th Dist.] 2005, pet. denied) (holding that plaintiffs' requested fraud damages were speculative and would provide them with the windfall of a riskless investment in a high-risk field). In short, the record is simply devoid of the required "objective facts, figures, or data from which the amount of lost profits may be ascertained." *Holt Atherton*, 835 S.W.3d at 84.

Further, the Court was not able to find, nor has the Trustee cited to, any case law holding that damages for failure to fund under a loan agreement are properly measured by outstanding availability. Instead, in his post-trial brief, the Trustee argues that the unfunded amounts represent benefit-of-the-bargain damages;[17] however, part of the "bargain" was that H&M would be obligated to repay the amounts borrowed. Indeed, each advance was accompanied by a corresponding liability on H&M's books, resulting in a neutral effect on H&M's net value. The fact that Scattered's lien position was subordinate to Prospect's does not somehow alleviate H&M's obligation to repay the funded amounts. As stated by Scattered in its post-trial brief, "$7.2 million is not a damage; it is a cost that the Plaintiff has avoided by not having to perform. As such, it must be subtracted from the Plaintiff's gross receipts or profits." Scattered Corporation's Trial Brief in Opposition to the Plaintiff's Claim that he is Entitled to Recover Costs or Lost Profits Damages [Dkt. No. 167] at 5 (citing *Qaddura v. Indo-European Foods, Inc.,* 141 S.W.3d 882, 889 (Tex. App. – Dallas 2004, no pet.) ("The benefit of the bargain is measured by the prevailing party's anticipated receipts and losses caused by the breach less any cost or other loss he has avoided by not having to perform."); *LaFarge Corp. v. Wolff, Inc*., 977 S.W.2d 181, 187 (Tex. App. – Austin 1998, writ denied) ("A party's expectation interest is measured by his anticipated receipts and losses caused by the breach less any cost or other loss he has avoided by not having to perform.)). From the Court's perspective, availability under the DIP Agreement is not a proper measure of damages.

Finally, the Court finds that the estate's incurrence of attorneys' fees and expenses allegedly arising from Scattered's failure to fund are not a proper measure of consequential damages either. "To be liable for the consequential damages resulting from a breach of a loan

---

[17] Trustee's Post-Trial Brief [Dkt. No. 172] at ¶ 4.

commitment, the lender must have known, at the time the commitment was made, the nature of the borrower's intended use of the loan proceeds but not the details of the intended venture." *Basic Capital Mgmt., Inc.*, 348 S.W.3d at 903. Further, consequential damages are not recoverable unless they were foreseeable. *Arthur Andersen & Co.*, 945 S.W.2d at 816; *Mead*, 615 S.W.2d at 687.

For example, in *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998), the Texas Supreme Court overturned an award of consequential damages, finding that the damages were not foreseeable. *Id.* There, a law firm sued a former client for non-payment, and argued that, as a result of her non-payment, the firm was unable to finance cases that it would have taken on contingency. *Id.* The law firm was successful at trial, and the jury awarded the law firm $500,000 for the lost contingency fees that it could have earned. However, the Texas Supreme Court found that such a loss was not foreseeable. *Id.* ("[I]t would be a rare case in which an attorney or law firm could demonstrate that the failure of a client to pay its bills gave rise to a recovery of contingent fees that might have been earned from other clients."). Similarly, in *Petco Animal Supplies, Inc. v. Schuster*, 144 S.W.3d 554, 566 (Tex. App. – Austin 2004, no pet.), an action brought by a pet owner to recover damages allegedly incurred when the pet escaped from its groomer and was killed in traffic, the court found that the plaintiff could not recover lost wages as consequential damages because the "[l]ost wages [while searching for the pet] . . . ha[d] too attenuated a connection to [the defendant's] conduct under her breach of contract theory."

Here, it is undisputed that Scattered was aware that H&M would use amounts drawn under the DIP Agreement to fund its drilling program. DIP Order [Gr. Ex. I.1] at ¶ F ("H&M, having advised the Court that it intends to undertake a drilling program to increase the value of

tis bankruptcy estate….") and p. 12 (reflecting the signature of Scattered's counsel on the DIP Order). The Trustee's requested damages, however, go far beyond those attributable to a potential drilling program and cannot be found to have been foreseeable.

The Trustee's "domino effect" argument on this point may be summarized as follows: (1) Scattered's failure to fund under the DIP Agreement led to non-payment of AFEs; (2) non-payment of AFEs led to Hibernia Resources issuing notices deeming H&M a non-consenting party with respect to two wells (each a "**Notice of Non-Consent**"); (3) issuance of the Notices of Non-Consent led to Prospect declaring a breach under the Second Interim Cash Collateral Order and termination of H&M's right to use cash collateral; (4) termination of H&M's right to use cash collateral and the issuances of the Notices of Non-Consent played a role in the appointment of a Trustee; and (5) the estate then incurred substantial attorneys' fees and other expenses related to the appointment of a trustee and the resulting settlement with Hibernia.[18] The Court finds that the consequential damages allegedly suffered by H&M are far too remote and attenuated to be a foreseeable consequence of Scattered's alleged failure to fund and, as such, cannot serve as a proper measure of consequential damages.

Further, in addition to being too remote, the Court finds that it would be improper to charge Scattered for attorneys' fees and costs that do not appear to have arisen from Scattered's alleged actions, but instead from the prepetition relationship between H&M and Prospect. Indeed, the acrimonious relationship between H&M and Prospect became evident to the Court[19] when Prospect filed its first motion to appoint a trustee only two days into H&M's bankruptcy case, well before H&M entered into the DIP Agreement or Scattered's alleged failure to fund

---

[18] *See* § II.B.2.b)*, infra,* for additional background regarding the circumstances surrounding the issuance of the AFEs and the Notices of Non-Consent.

[19] The Court will take judicial notice of its dockets in the main case and this adversary proceeding. *Sec. & Exch. Comm'n v. First Fin. Group of Tex.*, 645 F.2d 429, 433 n 6 (5th Cir. 1981) (noting that "a court may take judicial notice of its own records"); *In re Wells*, 426 B.R. 579, 587 n.2 (Bankr. N.D. Tex. 2006).

under it. Although Prospect's first motion to appoint a trustee was denied, its second request was granted. The Court notes, however, that the primary reason that the Trustee was appointed was because, after the Court denied its first motion to appoint a trustee, Prospect purchased all outstanding general unsecured claims against the H&M estate at par. At the hearing on Prospect's second motion to appoint a trustee, Prospect made it abundantly clear to the Court that it would not consent to a plan proposed by H&M while under Greenblatt's management. Thus, although the second motion to appoint a trustee was based on substantially the same grounds as those alleged against Greenblatt in the Complaint, the Court specifically found that it did not need to address those allegations at the hearing on Prospect's second trustee motion in light of Prospect's purchase of the remainder of the prepetition debt owed by H&M. Trial Tr., Nov. 14, 2012, at 215:15-216:15 (Bankr. Case No. 12-32785 at Dkt. No. 175). In fact, because H&M, as debtor-in-possession, could not confirm a plan of reorganization now that Prospect owned all prepetition claims against it and would not support a Greenblatt-led plan, H&M acquiesced to the Trustee's appointment. *Id.*

Clearly, Prospect's desire to oust Greenblatt as H&M's Manager through the appointment of a trustee arose prior to, and independent of, Scattered's actions as alleged in the Complaint. Thus, there is simply no causal connection between Scattered's actions, as alleged in the Complaint, and H&M's incurrence of attorneys' fees and costs associated with the Trustee's appointment.

Another contributing factor to the fees and costs associated with the Trustee's appointment was H&M's inability to use cash collateral, which occurred after Prospect declared a default under the Second Interim Cash Collateral Order. The alleged default was based on Hibernia Resources issuing a Notice of Non-Consent to H&M due to its failure to prepay

completion costs under the JOA. As discussed in § II.B.2.b), *infra*, however, the JOA did not permit Hibernia Resources to issue the Notice of Non-Consent for failure to prepay completion costs. As such, Prospect declared a breach under the Second Interim Cash Collateral Order based on Hibernia Resources' improper issuance of the Notice of Non-Consent.

For all of these reasons, and based on the record before it, the Court finds that it would be improper to award damages against Scattered for the fees and expenses associated with the litigation surrounding the Trustee's appointment.

The Trustee also seeks to recover from Scattered the $100,000 H&M paid to the Hibernia entities as part of the Court-approved settlement. *See* §II.B.3, *infra* for a discussion of the settlement agreement. The record shows, however, that the settlement that the Trustee negotiated with the Hibernia entities was virtually identical to the settlement negotiated between H&M and the Hibernia entities while Greenblatt acted as H&M's Manager and prior to the Trustee's appointment. *See id.* The only material difference in the two settlements was that the Trustee-negotiated settlement required a $100,000 payment to the Hibernia entities, while the Greenblatt-led settlement did not. Prospect refused to consent to Greenblatt's more favorable settlement, but consented to the Trustee's less favorable one, which required the expenditure of $100,000 of its cash collateral. In short, Scattered should not be charged with foreseeing Prospect's refusal to make a rational business decision with respect to the estate's settlement with the Hibernia entities.

Finally, the Trustee seeks to charge Scattered for certain fees and costs incurred in administering H&M's bankruptcy case. What the Trustee's argument fails to recognize, however, is that H&M's estate would need to be administered, and the related costs and expenses of professionals incurred, regardless of Scattered's alleged actions and the Trustee's

appointment. There is simply nothing in the record indicating that such costs could have been avoided had Scattered funded the Disputed DIP Requests. Because such costs would have existed regardless of Scattered's actions, the Court finds that it would be improper to award damages against Scattered for the costs of administering H&M's bankruptcy case.

The Court will now turn to Scattered's second argument, which it raised for the first time in its post-trial brief,[20] that H&M waived its right to seek consequential damages pursuant to § 8.4(c) of the DIP Agreement, which states

> Waiver of Consequential Damages, Etc. To the extent permitted by applicable law, the Debtors, or either of them, shall not assert and hereby waives any claim against any Indemnitee on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of this Agreement or any agreement or instrument contemplated hereby and thereby, the Transactions, any Advance or the use of the proceeds thereof.

DIP Agreement [Gr. Ex. H.1] at § 8.4(c). For the reasons explained below, this Court concludes that Scattered waived this defense by not pleading it or otherwise raising it prior to trial.

Under Federal Rule of Civil Procedure 8(c), as made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7008, waiver is an affirmative defense that is subject to forfeiture and waiver if not properly and timely raised. FED. R. CIV. P. 8(c).

> Generally, under Rule 8(c)[,] affirmative defenses must be raised in the first responsive pleading. However, where the matter is raised in the trial court in a manner that does not result in unfair surprise ... technical failure to comply precisely with Rule 8(c) is not fatal. An affirmative defense is not waived if the defendant raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.

*Kariuki v. Tarango*, 709 F.3d 495, 508 (5th Cir. 2013) (citing *Pasco ex rel. Pasco v. Knoblauch,* 566 F.3d 572, 577 (5th Cir. 2009)) (internal quotations omitted).

---

[20] Scattered's Post-Trial Brief [Dkt. No. 171] at 6, 10, 13.

Based on the record before it, the Court finds and concludes that Scattered waived the affirmative defense of waiver by addressing it for the first time in its post-trial brief. Due to this timing, Scattered failed to raise the defense at a pragmatically sufficient time, and to allow Scattered to raise the affirmative defense post-trial would result in prejudice to the Trustee.

### B. Count 4: Breach of Fiduciary Duty (Brickley v. Greenblatt)

To prevail and recover damages on his breach of fiduciary duty claim, the Trustee must show that: (1) Greenblatt had a fiduciary relationship with H&M, (2) Greenblatt breached his fiduciary duties to H&M, and (3) Greenblatt's breach resulted in injury to H&M or benefit to Greenblatt.[21] *See Navigant Consulting, Inc. v. Wilkinson*, 508 F.3d 277, 283 (5th Cir. 2007); *In re ReoStar Energy Corp.,* No. 12-CV-046-A, 2012 WL 3184726, at *5 (N.D. Tex. Aug. 3, 2012). Intentional breach of fiduciary duty is a tort for which the Trustee may recover exemplary damages. TEX. CIV. PRAC. REM. CODE § 41.003. For the reasons explained below, the Court finds that the Trustee has failed to carry his burden of proof, and thus concludes that the Trustee's breach of fiduciary duty claim against Greenblatt fails.

### 1. As its Manager, Greenblatt Owed Fiduciary Duties to H&M.

As an initial matter, the Court notes that the parties do not dispute that Greenblatt served as H&M's Manager from August 1, 2008 to November 14, 2012. JPTO at 11, ¶¶ 22-23. As its Manager, Greenblatt owed fiduciary duties to H&M, including the duties of care and loyalty. To determine whether Greenblatt breached those fiduciary duties, a brief overview of the relevant standard is necessary.

---

[21] In its Order Granting in Part and Denying in Part Leon A. Greenblatt, III's Motion for Partial Summary Judgment [Dkt. No. 161], the Court previously ruled that "[n]o damages are recoverable from Greenblatt as to any personal benefit alleged to have been gained or received by him for any breach of fiduciary duty," based on the Trustee's failure to provide evidence raising a genuine issue of material fact in response to Greenblatt's no evidence motion for summary judgment on this issue. Accordingly, in its damages analysis, the Court will only consider whether Greenblatt's alleged breach of fiduciary duty resulted in injury to H&M.

"The duty of care requires officers and directors to manage the company's affairs with diligence and prudence." *Roth v. Mims*, 298 B.R. 272, 285 (N.D. Tex. 2003) (citing *Gearhart Indus., Inc. v. Smith Int'l, Inc.,* 741 F.2d 707, 719 (5th Cir. 1984)). "Due care is defined as that degree of care which a person of ordinary prudence would exercise under the same or similar circumstances." *Id.* (citations and internal quotations omitted). In general, the duty of care will be satisfied if the officer's actions comport with the standard of the business judgment rule. *Gearhart*, 741 F.2d at 723 n.9.

> The Texas business judgment rule, which originated in *Cates v. Sparkman*, 73 Tex. 619, 11 S.W. 846, 849 (1889), provides that the negligence of directors, no matter how unwise or imprudent, does not constitute a breach of duty if the acts were "within the exercise of their discretion and judgment in the development or prosecution of the enterprise in which their interests are involved." *Resolution Trust Corp. v. Acton,* 844 F. Supp. 307, 315 (N.D. Tex. 1994) (quoting *Cates*, 11 S.W. at 849). Texas courts, like other jurisdictions, do not apply the business judgment rule in cases where the challenged corporate decision "lacks a business purpose, is tainted by a conflict of interest, is so egregious as to amount to a no-win decision, or results from an obvious and prolonged failure to exercise oversight or supervision." *Resolution Trust*, 844 F. Supp. at 314.

*Roth*, 298 B.R. at 282-83.

On the other hand, "[t]he duty of loyalty dictates that a corporate officer or director must act in good faith and must not allow his or her personal interest to prevail over the interest of the corporation. The duty of loyalty requires an extreme measure of candor, unselfishness, and good faith on the part of the officer or director." *Landon v. S & H Mktg. Grp,* 82 S.W.3d 666, 672 (Tex. App. – Eastland 2002, no pet.) (citing *Int'l Bankers Life Ins. Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963)). "While the duty of loyalty is generally directed towards a fiduciary's motivations in making a business decision, the duty of care concerns the care taken in the process by which that decision was reached." *Kaye v. Lone Star Fund V (U.S.), L.P.*, 453 B.R. 645, 680 (N.D. Tex. 2011). Further, "interested" transactions are subject to a higher level of scrutiny.

> The duty of loyalty holds officers and directors to an "extreme measure of candor, unselfishness and good faith," particularly where there is an interested transaction. *International Bankers Life Insurance Co. v. Holloway*, 368 S.W.2d 567, 577 (Tex. 1963). Whether an officer or director is "interested" is a question of fact. *Id.* Interested transactions include those in which officers or directors derive personal profit as well as those which deprive the corporation of an opportunity to profit. *Assurance Systems Corp. v. Jackson (In re Jackson)*, 141 B.R. 909, 916 (Bankr. N.D. Tex. 1992). A transaction between a fiduciary's corporation and another corporation in which the fiduciary has a significant financial interest is also an interested transaction. *Id.* In such a situation, an officer or director must not allow his personal interests to prevail over the interests of the corporations. *Gearhart Industries, Inc. v. Smith International, Inc.,* 741 F.2d 707, 719–20 (5th Cir. 1984).

*Mims v. Roth (In re Performance Nutrition, Inc*.), 239 B.R. 93, 110 (Bankr. N.D. Tex. 1999).

With these precedents in mind, the Court will now turn to whether Greenblatt breached the duties of care and loyalty he owed to H&M as its Manager by: (1) failing to timely pay drilling costs, (2) not requesting funds under the DIP Agreement to prepay completion costs, and (3) not taking action against Scattered related to its alleged breach of the DIP Agreement. *See* Trustee's Post-Trial Brief [Dkt. No. 172] at ¶ 11 (listing alleged breaches).[22]

## 2. Greenblatt Did Not Breach the Fiduciary Duties He Owed to H&M.

Before the Court begins its analysis regarding Greenblatt's alleged breaches of fiduciary duty, additional background is required to put the Trustee's arguments into context. On February 4, 2004, H&M Resources, as operator, and Costas Oil & Gas, Ltd., as non-operator, entered into the JOA. H&M and Hibernia Holdings, LLC ("**Hibernia Holdings**")[23] succeeded to the interests of Costas as non-operators under the JOA. JPTO at 11, ¶ 10. H&M owned a 80.875%

---

[22] Many of the breaches alleged in the Trustee's Post-Trial Brief overlap or are duplicative. *See* Trustee's Post-Trial Brief [Dkt. No. 172] at ¶ 11. As such, the Court has shortened the Trustee's list to that contained in this Memorandum Opinion, which, as categorized, covers all material, alleged breaches described in the Trustee's Post-Trial Brief. But, to be clear, the Court finds no breaches of fiduciary duty by Greenblatt on the record before it.

[23] Hibernia Holdings, LLC is the parent company of Hibernia Resources. Hibernia Holdings holds the ownership interests, while Hibernia Resources performs the drilling operations.

working interest in various oil and gas leases located on the Holt Ranch in Martin County, Texas, while Hibernia Holdings owned the remaining 19.125% working interest. *Id.* at 10, ¶¶ 11-12.

On August 8, 2012, H&M Resources and Hibernia Resources entered into a Subcontract Agreement whereby Hibernia Resources agreed to serve "as a subcontractor to serve in the nature of a contract operator pursuant to the JOA to drill and complete and rework any oil and gas wells on the Property." Subcontract Agreement [Gr. Ex. C.1] at 1.  In its role as contract operator, Hibernia Resources undertook to begin drilling operations on various well sites located on the Martin County property, which included: (1) the Dorothy Faye 319A #5 (the "**DF 319A #5**"); (2) the Holt Ranch 248 #2 (the "**HR 248 #2**"); (3) the Dorothy Faye K #13; and (4) the Dorothy Faye 320 #6.

As relevant here, the Trustee's breach of fiduciary duty allegations against Greenblatt revolve around Greenblatt, as H&M's Manager, allegedly (1) not timely requesting funds under the DIP Agreement, and/or (2) either directing that H&M late pay, or not pay, AFEs issued to H&M by Hibernia Resources as operator under the JOA.  The costs addressed in the AFEs at issue fall into two categories:  (1) costs for initially drilling a well (referred to as drilling costs), and (2) costs for completing a well to production (referred to as completion costs).  The parties disagree as to when H&M was required to pay each of these costs, as well as the risks to H&M associated with failing to timely pay these costs.  With this distinction in mind, the Court will now return to the Trustee's allegations.

> a)    **Failure to Timely Pay AFEs Related to Drilling Costs, With No Resulting Harm, Does Not Constitute a Breach of Fiduciary Duty.**

The Trustee argues that Greenblatt directed H&M to late-pay multiple AFEs related to drilling costs, which shows a pattern of mismanagement, particularly in light of the multiple risks associated with failing to pay drillings costs, including (1) H&M losing its interests in the

underlying properties due to drilling obligations imposed by the leases, (2) Hibernia Resources issuing a Notice of Non-Consent that could, in turn, result in H&M incurring substantial penalties associated with being deemed a non-consenting party under the JOA, (3) potential litigation with Hibernia Resources related to the failure to timely pay, and (4) violations of the DIP Agreement and/or the Second Interim Cash Collateral Order. The Trustee argues that repeated late payments, in light of the risks associated with such late payments, do not reflect the actions of a prudent manager.

As discussed below, the Court disagrees that a pattern of late payments, without any resulting harm, can serve as the basis for a claim of breach of fiduciary duty. At trial, Greenblatt's unrefuted testimony was that he always intended for H&M to pay the drilling costs; it was not a question of if H&M would pay, but when. As testified to by Carl Carter, Chief Financial Officer of Hibernia Holdings (the parent company of Hibernia Resources), the JOA includes notice and grace period provisions that permitted H&M to delay payments without risking the immediate issuance of a Notice of Non-Consent. Indeed, as Carter testified, the JOA gave H&M fifteen days to pay for amounts billed in an AFE. If the payment was not timely received, Hibernia Resources could choose to send a notice demanding payment, at which point payment was due within five days. *See* JOA [Gr. Ex. A.1] at § 15.14 ("Should Non-Operator fail to pay its share of the costs of drilling any well hereunder within 15 days from receipt of an invoice therefore in accordance with Article XV.15.13 hereto, Operator shall give written notice to Non-Operator of such default, and if payment is not received within 5 days from receipt by Non-Operator of such notice, Operator may at its election declare such Non-Operator to be a non-consenting party … ."). In fact, the record shows that H&M never received a Notice of

Non-Consent for failure to pay drilling costs, nor was there any evidence of injury to H&M resulting from Greenblatt's decision to late-pay drilling costs.

As previously detailed, one of the three required elements for a claim of breach of fiduciary duty is injury. Based on the record before it, however, the Court cannot find that Greenblatt's decision to direct H&M to late-pay certain AFEs for drilling costs resulted in injury to H&M. As such, even if the late payments were somehow imprudent, there was no resulting injury to H&M and, without a showing of injury, this Court cannot find a breach of fiduciary duty.

> **b)** **Greenblatt's Decision Not to Request Funds Under the DIP Agreement to Prepay Completion Costs, Based upon His Interpretation of the JOA, Was Not a Breach of Fiduciary Duty.**

The Trustee also alleges that Greenblatt breached his fiduciary duties by failing to direct H&M to timely request funds under the DIP Agreement to prepay completion costs in accordance with the AFEs issued by Hibernia Resources, as a prudent manager would do, particularly in light of the attendant risks (as detailed in § II.B.2.a), *supra*). The Trustee points to evidence showing that (1) in late September and early October 2012, there were significant amounts due for completion costs, including $923,700.87[24] for well DF 319 A #5 (Tr. Ex. 15) and $917,889 for well HR 248 # 2 (Tr. Ex. 18), (2) the full amount of the DIP was outstanding when these AFEs were issued, and (3) nonpayment of the completion costs ultimately led to the issuance of the Notices of Non-Consent on both of these wells (Gr. Ex. T.2 and M.3). Although the Trustee acknowledges Greenblatt's argument that the JOA does not permit Hibernia Resources to issue a Notice of Non-Consent for failure to prepay completion costs, he disagrees

---

[24] During closing argument, the Trustee's counsel explained that Hibernia Resources had received a payment of $25,870. Thus, although the AFE at Tr. Ex. 15 indicates that $949,571.21 was owing, the correct amount was $923,700.87.

with Greenblatt's interpretation of the JOA and argues that, in any event, the prudent action would have been for Greenblatt to direct H&M to prepay the completion costs and then proceed under the audit/protest procedures in the JOA. *See* JOA [Gr. Ex. A.1] at Ex. C, Art. 1 ¶¶ 4-5. According to the Trustee, this action would have alleviated substantially all of the associated risk, and was the only prudent course of action.

In response, Greenblatt argues that the express terms of the JOA do not permit Hibernia Resources to issue a Notice of Non-Consent based solely on H&M's failure to prepay completion costs; instead, the only penalty for non-payment is interest accrual. Further, at trial, Greenblatt testified that his reason for not paying the completion costs under protest was that he believed it was necessary for him to follow the express terms of the JOA, particularly since H&M was in bankruptcy and he did not want to take actions contrary to the JOA that might further inflame the adversarial relationship between H&M and Prospect. *See* Gr. Ex. X.2 (email from Greenblatt to Jones dated October 4, 2012 stating that "[w]e do not have the itemized bill required by the JOA and I am not going to catch shit from the court, Prospect or anyone else for not following the procedures set forth in [the] assumed JOA."); Gr. Ex. P.4 (email from Greenblatt to various attorneys dated November 11, 2012, stating that "[H&M] made every effort to pay timely consistent with the JOA. … [Hibernia Resources] refused to submit the itemization of estimated invoices required in VII C. It is not gross mismanagement to enforce the terms of a contract."). Finally, after Hibernia Resources issued the Notices of Non-Consent, H&M, at Greenblatt's direction, initiated an adversary proceeding against Hibernia Resources seeking, among other things, a declaratory judgment that Hibernia Resources did not have the right to declare H&M a non-consenting party for failure to prepay completion costs. *See* Complaint for Declaratory Judgment, Adv. Proc. No. 12-3237 [Gr. Ex. M.1]. According to

Greenblatt, these actions were both consistent with his fiduciary duties to H&M and the terms of the JOA.

To determine whether Greenblatt's decision to not prepay completion costs under AFEs issued by Hibernia Resources was a breach of fiduciary duty, the Court must consider the operative documents. As its starting point, the Court will first turn to the Notices of Non-Consent issued by Hibernia Resources to H&M on October 4, 2012, regarding well DF 319 A #5 (Gr. Ex. T.2), and October 10, 2012, regarding well HR 248 #2 (Gr. Ex. M.3). Each of these notices solely and specifically reference JOA § 15.14, which states:

> Should Non-Operator [H&M] fail to pay its share of the **costs of drilling** any well hereunder within 15 days from receipt of an invoice therefore, in accordance with Article XV.15.13 herein, Operator shall give written notice to Non-Operator of such default and if payment is not received within 5 days from receipt by Non-Operator of such notice, **Operator may at its election declare such Non-Operator to be a non-consenting party for the proposed drilling operation under the terms of Article VI.B.2[25] of this agreement**.

JOA [Gr. Ex. A.1] at § 15.14 (emphasis added). In turn, JOA § 15.13 states:

> Each Non-Operator shall be obligated to pay Operator **in advance** for its proportionate share of all estimated **costs to casing point** of any well drilled pursuant hereto in which Non-Operator has agreed to participate subject to Article VI.B.1. Operator shall furnish each Non-Operator with an appropriate invoice for each such well drilled hereunder and each Non-Operator shall pay its share of such costs within 15 days of receipt of such invoices any amounts not timely paid in accordance therewith shall bear interest at the rate provided for in paragraph I. 3.B of the accounting procedure attached hereto as Exhibit "C" [26]. Non-

---

[25] JOA Article VI.B establishes the relationship between consenting and non-consenting parties to a well. In general terms, the entire cost and risk of conducting the drilling operations is borne by the consenting parties in their agreed-upon proportions. *Id.* at Art. VI.B.2 (Operations by Less than All Parties). If the well produces oil and/or gas in paying quantities, the consenting parties complete and equip the well to produce, also at their sole cost and risk. *Id.* The well is then turned over to the "operator," here Hibernia Resources, to be operated by it at the expense and for the account of the consenting parties. *Id.* There is a non-consent "penalty" of 300%, which gives the consenting parties the right to recover 300% of their respective costs for: (1) all newly acquired surface equipment beyond the wellhead connections, (2) drilling, reworking, deepening, plugging back, testing, and completing the well, and (3) the cost of all newly acquired equipment in the well. *Id.* at § VI.B.2(a) and (b).

[26] JOA Exhibit C, paragraph I.3.B provides that if payment is not timely made, "the unpaid balance shall bear interest monthly at the prime rate in effect at Bank of Oklahoma on the first day of the month in which delinquency occurs plus 1% or the maximum contract rate permitted by the applicable usury laws in the state in which the Joint Property is located, whichever is the lesser, plus attorneys' fees, court costs, and other costs in connection with the collection of unpaid amounts."

Operator will not be billed more than thirty (30) days prior to commencement of the proposed operation, unless Operator is invoiced and required to make any such payment.

*Id.* at § 15.13 (emphasis added).

Although not focused on by the parties, the Court also notes Article VII.B (Liens and Payment Defaults), pursuant to which each non-operator grants to the operator a "lien upon its oil and gas rights in the Contract Area, and a security interest in its share of oil and/or gas when extracted and its interest in all equipment, to secure payment of its share of expenses, together with interest thereon at the rate provided in Exhibit "C." Further pursuant to this section:

If any party fails or is unable to pay its share of expense within sixty (60) days after rendition of a statement therefor by Operator, the non-defaulting parties, including Operator, shall, upon request by Operator, pay the unpaid amount in the proportion that the interest of each such party bears to the interest of all such parties. Each party so paying its share of the unpaid amount shall, to obtain reimbursement thereof, be subrogated to the security rights described in the foregoing paragraph.

*Id.* at Art. VII.B. Similarly, Article VII.C (Payment and Account), states that:

Operator, at its election, shall have the right from time to time to demand and receive from the other parties **payment in advance** of their respective shares of the estimated amount of the **expense to be incurred in operations** hereunder during the next succeeding month, which right may be exercised only by submission to each such party of an itemized statement of such estimated expense, together with an invoice for its share thereof. Each such statement and invoice for the payment in advance of estimated expense shall be submitted on or before the 20th day of the next preceding month. Each party shall pay to Operator its proportionate share of such estimate within fifteen (15) days after such estimate and invoice is received. **If any party fails to pay its share of said estimate within said time, the amount due shall bear interest as provided in Exhibit "C" until paid.** Proper adjustment shall be made monthly between advances and actual expense to the end that each party shall bear and pay its proportionate share of actual expenses incurred, and no more.

*Id.* at Art. VII.C.

With these provisions in mind, the Court will now turn to whether Greenblatt's actions, based upon his interpretation of the JOA, constituted a breach of fiduciary duty. As explained

below, the Court concludes that Greenblatt's interpretation of the JOA was correct; thus, his decision to abide by the terms of the JOA was not a breach of fiduciary duty.

Section 15.14 of the JOA permits Hibernia Resources to deem H&M a non-consenting party based upon H&M's failure to timely pay *drilling* costs after the issuance of required notices by Hibernia Resources and the passage of various grace periods. JOA [Gr. Ex. A.1] at § 15.14 ("Should Non-Operator [H&M] fail to pay its share of the **costs of drilling** … Operator may at its election declare such Non-Operator to be a non-consenting party…."). Notably, the Court could not find, nor did the Trustee cite to, any provision of the JOA similar to § 15.14 that authorized Hibernia Resources to deem H&M a non-consenting party based upon its failure to timely prepay *completion* costs. Thus, from the Court's perspective, the operative question is whether the "costs of drilling," as used in JOA § 15.14, include completion costs.

The JOA is silent as to the distinction between drilling and completion costs. However, Hibernia Resources and H&M Resources also executed the Subcontract Agreement, which was agreed to by H&M. Subcontract Agreement [Gr. Ex. C.1] at 1, 5. Pursuant to § 3.1 of the Subcontract Agreement, "[t]he parties intend this Agreement to be a supplement to and an integral part of the JOA…. This Agreement, together with the JOA, is to be construed as a 'Joint Operating Agreement' for all purposes under Texas law, including without limitation, Chapter 127, Texas Civil Practice & Remedies Code." *Id.* at § 3.1. Pursuant to the Subcontract Agreement, costs for "drilling" and costs for "completion" are separate and distinct costs.

> The term "Drilling" shall mean all operations, including, but not limited to, directional control other than sidetracking, reasonable, necessary and incident to the drilling of a well to its projected depth, including preparation of roads and drillsite, testing and logging, **but excluding completion operations**.

*Id.* at 1 (emphasis added). While,

> [t]he term 'Completion' and 'Recompletion' shall mean a single stage or multistage operation **intended to complete a well as a producer** of oil and gas in

one or more zones, including, but not limited to the setting of production casing, perforating, well stimulation and production testing completed in such operation **resulting in an oil or gas well capable of flowing or being pumped**.

*Id*. (emphasis added).

When read in conjunction, the Court finds the JOA and the Subcontract Agreement to be unambiguous regarding the scenario under which Hibernia Resources may issue a Notice of Non-Consent. Pursuant to § 15.14 of the JOA, Hibernia Resources may only deem H&M to be a non-consenting party in the event that it fails to timely pay drilling costs.[27] Per the JOA, the penalty for failing to prepay completion costs are the accrual of interest, which is secured, along with the unpaid amounts, by a lien against H&M's interests as described in Article VII.B of the JOA.

As such, the Court concludes that Greenblatt correctly interpreted the JOA. The Court recognizes that prepaying the completion costs per the AFEs subject to protest was an option available to H&M; however, that course of action also had attendant risks, such as legal costs associated with enforcing the terms of the JOA in seeking a return of the funds and Hibernia Resources having the funds on-hand to repay H&M. Accordingly, the Court concludes that Greenblatt did not breach his fiduciary duties to H&M when he decided not to prepay completion costs.

Further, the Court concludes that Greenblatt's actions in this regard fall within the business judgment rule. Although Greenblatt served as both H&M's Manager and an officer of Scattered, he was not an insider of Hibernia Resources and his dealings with Hibernia Resources were not an "interested" transaction subject to heightened scrutiny. Under the JOA, H&M had

---

[27] The Court notes that the JOA is based upon the A.A.P.L. Form 610-1982. This form was subsequently updated by the A.A.P.L. Form 610-1989. The 1989 form contains additional provisions in Article VII, including VII.D (Defaults and Remedies). Article VII.D.3 (Deemed Non-Consent) permits the operator to deliver a written notice of non-consent to a defaulting party who fails to timely pay either drilling or completion costs. This provision is missing from the 1982 form.

two potential options when dealing with Hibernia's issuance of AFEs demanding prepayment of completion costs. Although the Trustee argues that paying the amounts under protest was the "more prudent" course of action, the evidence does not show that Greenblatt's decision to enforce the terms of the JOA lacked a business purpose, was tainted by a conflict of interest, or was the result of an obvious and prolonged failure to exercise oversight or supervision. Thus, the Court finds and concludes that Greenblatt's decision to not prepay completion costs based upon his interpretation of the JOA was the result of his informed business judgment and, as such, was not a breach of the fiduciary duty of care he owed to H&M as its Manager.

<b>c)    Greenblatt's Failure to Take Further Action Against Scattered for Its Alleged Breach of the DIP Agreement Was Not a Breach of Fiduciary Duty.</b>

The Trustee alleges that Greenblatt breached his fiduciary duties to H&M when he failed to direct that H&M take action against Scattered in relation to its alleged breach of the DIP Agreement. The record, however, clearly shows that action was taken against Scattered, as reflected in the demand letter sent by Anderson Tobin PLLC, on behalf of H&M, to Scattered dated October 12, 2012. Tr. Ex. 85 (the "**Demand Letter**"). The Demand Letter states that "[b]y not funding the [$925,000] advance, Lender is in default of the [DIP] Agreement and has potentially caused [H&M] to default on certain payment obligations. [H&M] demands that Lender immediately fund the $925,000 advance." *Id.*

Although Greenblatt testified that he first directed that the Demand Letter be sent, he then directed that it be rescinded. But, the Demand Letter had already been sent, and counsel for the Trustee and Scattered stipulated on the record that the Demand Letter was actually received by Scattered. *See* JPTO at 11, ¶ 40. On November 28, 2012, the Trustee was appointed and Greenblatt was no longer in control of H&M. Order Approving Appointment of Trustee [Gr. Ex. P.1].

Based upon this record, the Court finds that Greenblatt began to take action on behalf of H&M to address Scattered's alleged breach of the DIP Agreement; however, the Trustee's appointment divested Greenblatt of authority to take any further action on behalf of H&M. Moreover, the Court has already found that Scattered did not breach the DIP Agreement. *See* § II.A.1, *supra*. Because Scattered did not breach the DIP Agreement, Greenblatt's alleged failure to take action against Scattered for breaching the DIP Agreement cannot constitute a breach of fiduciary duty to H&M.

### 3. Had Greenblatt Breached the Fiduciary Duties He Owed to H&M, Prospect's Actions Were an Intervening and Superseding Cause of H&M's Alleged Injuries.

Although the Court previously found that Greenblatt did not breach the fiduciary duties he owed to H&M, it will nonetheless address Greenblatt's argument that his actions were not the proximate cause of the alleged injuries suffered by H&M. More specifically, Greenblatt argues that Prospect's refusal to consent to a proposed settlement that would have resolved H&M's dispute with Hibernia Resources, prior to the Trustee's appointment, was an intervening cause of H&M's injuries. As discussed below, the Court finds Greenblatt's argument on this point persuasive and concludes that Prospect's actions were an intervening and superseding cause of H&M's alleged injuries. Additional background regarding the proposed settlement is necessary to place the Court's conclusion into context.

After entry into the Subcontract Agreement in August 2012, Hibernia Resources generally stepped into H&M Resources' shoes as operator under the JOA. Subcontract Agreement [Gr. Ex. C.1] at 1. In this capacity, Hibernia Resources would send AFEs to H&M, requesting payment or prepayment of expenses that were due after various notice and grace periods. The Trustee argues that H&M's failure to pay AFEs issued for prepayment of completion costs, which was done at Greenblatt's direction, led to Hibernia Resources issuing

the Notices of Non-Consent in October 2012 and the resulting "domino effect" that led to H&M

incurring the substantial damages that are the subject of this adversary proceeding.

After the Notices of Non-Consent were issued, however, H&M and Hibernia Resources

began discussing potential settlement terms. Both Jones, who negotiated on H&M's behalf, and

Carter, the Chief Financial Officer of Hibernia Holdings, testified that H&M and Hibernia

Resources reached an agreement in early November 2012, the material terms of which included,

among other things, that H&M would convey certain property interests to Hibernia Holdings and

receive other property from Hibernia Holdings in exchange. *See also* email from Jones to David

Belzer of Prospect dated November 6, 2012 [Gr. Ex. M.4] (explaining the terms of the proposed

conveyance). Jones testified that, because Prospect held a lien on the properties proposed to be

conveyed to Hibernia Holdings, Hibernia Holdings was requiring Prospect's consent to the

settlement. According to Jones, the exchange of properties was very favorable to H&M and

Prospect, which would be granted a lien on the to be acquired property. However, Prospect

refused to consent to the settlement, which was never consummated. Soon thereafter, on

November 28, 2012, the Trustee was appointed. Order Approving Appointment of Trustee [Gr.

Ex. P.1] at 1.

After his appointment, the Trustee entered into negotiations with the Hibernia entities to

resolve the issues between the parties. As Carter testified, the Trustee ultimately reached a

settlement with the Hibernia entities on terms identical to the Jones-negotiated settlement with

one exception – the Trustee's settlement included a $100,000 payment to the Hibernia entities

that was not part of the Jones-negotiated settlement. Although Prospect had refused to consent to

the Jones-negotiated settlement (which was more favorable to H&M), Carter testified that

Prospect did consent to the Trustee-negotiated settlement. The Trustee then filed a motion seeking Court approval of his settlement with the Hibernia entities, which the Court granted.[28]

With this background in mind, the Court will now return to Greenblatt's argument that Prospect's refusal to approve the Jones-negotiated settlement was an intervening cause of H&M's alleged $100,000 injury. Under Texas law, an intervening act is not necessarily a new and independent cause merely because it, in addition to the defendant's negligence, causes the plaintiff's injury. "Generally speaking, if the intervening force was foreseeable at the time of the defendant's negligence, the force is considered to be a concurring cause of the plaintiff's injuries, and the defendant remains liable for the original negligence." *Dew v. Crown Derrick Erectors, Inc.,* 208 S.W.3d 448 (Tex. 2006) (internal quotation marks omitted); *see also Pernod v. Schecter*, 319 S.W.3d 737, 745 (Tex. App. – El Paso 2009, pet. denied). A new and independent cause, as opposed to a concurring cause, is typically not only unforeseeable, but its consequences are unexpected or extraordinary. *Dew*, 208 S.W.3d at 451. The event "alters the natural sequence of events, produces results that would not otherwise have occurred, is an act or omission not brought into operation by the original wrongful act of the defendant, and operates entirely independently of the defendant's allegedly negligent act or omission." *Columbia Rio Grande Healthcare v. Hawley*, 284 S.W.3d 851, 857 (Tex. 2009) (citing *Dew*, 208 S.W.3d at 451). The, "threshold, and often controlling, inquiry" is whether the intervening act and its consequences were foreseeable. *Dew*, 208 S.W.3d at 452.

Here, the record shows that, prior to the Trustee's appointment: (1) H&M had negotiated a favorable settlement that would have resolved all of the issues between H&M and the Hibernia entities, (2) Court approval of that settlement would have stopped the alleged damages at issue

---

[28] *See* Order Granting Trustee's Expedited Motion to Compromise Controversy with Hibernia Resources, LLC and Hibernia Holdings, LLC Pursuant to Fed. R. Bankr. P. 9019 [Dkt. No. 260], entered March 8, 2013.

here from accruing,[29] and (3) Prospect refused to consent to the settlement and release its liens on the properties to be transferred to Hibernia Holdings in exchange for obtaining a lien on property to be transferred to H&M as part of the settlement. The Court, however, cannot discern any rational business justification for Prospect's refusal to consent to the Jones-negotiated settlement. The only evidence before the Court establishes that the property exchange (and hence the collateral exchange) was favorable to H&M and Prospect. Moreover, within weeks of refusing to consent to the Jones-negotiated settlement, Prospect consented to a virtually identical settlement negotiated by the Trustee, which was identical in its treatment of Prospect and its liens, but required the estate's expenditure of $100,000 of Prospect's cash collateral.

Based upon the facts established at trial, the Court finds that it was not foreseeable that Prospect, an established investment company, would act contrary to its own pecuniary interest and with no apparent business purpose in refusing to consent to the Jones-negotiated Hibernia settlement. Further, the consequences of Prospect's refusal to consent to the Jones-negotiated settlement, including the Trustee's negotiation of a settlement with the Hibernia entities on materially worse terms than those negotiated by H&M and the various fees and costs alleged in the Complaint, were extraordinary and not of the same nature as the damages that would have otherwise arisen from Greenblatt's decision to not prepay completion costs.

Further, as Greenblatt testified at trial, upon resolution of H&M's default under the Second Interim Cash Collateral Order and the DIP Agreement, Scattered would have resumed funding under the DIP Agreement. Thus, with the Jones-negotiated settlement in place, a significant portion of the alleged damages at issue here would not have accrued, including: (1) the $7.2 million, or alternatively $925,000, related to Scattered's alleged failure to fund, as

---

[29] Based on its approval of the less-favorable, Trustee-negotiated settlement, the Court would likely have approved the Jones-negotiated settlement.

Scattered would have resumed funding under the DIP Agreement; (2) the lost profits, as H&M would have had sufficient funds to proceed with its drilling program on at least an interim basis,[30] and (3) the $100,000 plus attorneys' fees and costs related to the Trustee-negotiated Hibernia settlement, as that settlement would never have occurred. The only alleged damages that would not have been prevented by Prospect's consent to the Jones-negotiated settlement were the fees and costs associated with the Trustee's appointment and the costs of administering H&M's estate. Though as discussed in more detail in § II.A.2, *supra*, it was Prospect's purchase of all general unsecured claims against the H&M estate, at par, and its refusal to consent to any plan proposed by H&M under Greenblatt's management that caused the Court to appoint the Trustee.

As such, the Court finds and concludes that (1) Prospect's refusal to consent to the Jones-negotiated settlement was not foreseeable, (2) the consequences resulting from Prospect's actions were unexpected and extraordinary, and (3) Prospect's actions altered the natural sequence of events to produce results that would not otherwise have occurred. Thus, Prospect's decision not to approve the Jones-negotiated settlement was an intervening and superseding cause of H&M's alleged injuries.

### C. Count 6: Objection to Administrative Wage Claims (Brickley v. Greenblatt)

As reflected in his Wage Claim, Greenblatt has asserted a claim for compensation for postpetition services rendered as H&M's Manager for the period from H&M's bankruptcy petition date (April 30, 2012) through November 2012. Wage Claim [Gr. Ex. X.1] at 1.

---

[30] There is nothing in the record indicating whether or not, upon consummation of the Jones-negotiated settlement, Prospect would have rescinded its notice of default and/or agreed to permit H&M to continue to use its cash collateral. However, even if Prospect did not consent, the Code permits the Court to authorize the use of cash collateral after notice and a hearing so long as Prospect can be adequately protected. 11 U.S.C. § 363(c)(2), (e).

According to Greenblatt, his claim is entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(1)(A). *Id.*

The Trustee objected to Greenblatt's Wage Claim on multiple grounds, including that (1) Greenblatt failed to show he is entitled to the amounts requested, (2) there is no written agreement entitling Greenblatt to the amounts requested, and (3) Greenblatt failed to previously disclose his claim to the Court and parties in interest, including by failing to include such amounts in the budget to the Second Interim Cash Collateral Order.

The Court's analysis of the Trustee's objection must begin with § 503(b) of the Bankruptcy Code. Specifically § 503(b)(1)(A), which governs the allowance of administrative expense claims against a bankruptcy estate, states, in relevant part, that: "[a]fter notice and a hearing, there shall be allowed administrative expenses…, including – (1)(A) the actual, necessary costs and expenses of preserving the estate including— (i) wages, salaries, and commissions for services rendered after the commencement of the case…."  11 U.S.C. § 503(b)(2)(A)(i).

According to the Fifth Circuit,

> In order to qualify as an "actual and necessary cost" under section 503(b)(1)(A), a claim against the estate must have arisen postpetition and as a result of actions taken by the trustee that benefitted the estate. *See Toma Steel Supply, Inc. v. Transamerican Natural Gas Corp. (In the Matter of Transamerican Natural Gas Corp.)*, 978 F.2d 1409, 1416 (5th Cir. 1992) (finding that a "prima facie case under § 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function").

*Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re of Jack/Wade Drilling, Inc.),* 258 F.3d 385, 387 (5th Cir. 2001) (request for administrative expense status under § 503(b)(1)(A)); *see also Lasky v. Phones For All, Inc. (In re Phones For All, Inc.),* 262 B.R. 914, 918 (N.D. Tex. 2001) ("Accordingly, an expense is entitled to administrative priority treatment only if (1) it

results from a transaction between the claimant and the trustee of the bankruptcy estate or a debtor in possession; and (2) the benefit to the debtor, and hence the right to payment, accrues post-petition."), *aff'd*, 288 F.3d 730 (5th Cir. 2002). The terms "actual" and "necessary" are to be construed narrowly. *NL Indus., Inc. v. GHR Energy Corp.*, 940 F.2d 957, 966 (5th Cir. 1992). Greenblatt bears the burden of proving that his claim is for actual, necessary costs and expenses of preserving the estate. *In re TransAmerican Natural Gas Corp.,* 978 F.2d 1409, 1416 (5th Cir. 1992).

The testimony at trial and the stipulations among the parties establish that Greenblatt served as H&M's Manager on an "at will" basis, with no employment contract. During his prepetition service, Greenblatt received a monthly salary of $6,000 per month. JPTO at 12, §§ 22-23. Although Greenblatt continued to serve as H&M's Manager on a postpetition basis, he was not paid a salary by H&M and H&M's postpetition budgets filed with the Court did not disclose any payment or accrual of Greenblatt's salary. *Id.* at ¶¶ 24-25. As such, the issue becomes whether Greenblatt was entitled to continue to receive his salary on a postpetition basis.

Although there is no written employment agreement, Greenblatt alleges that the LLC Regulations permit him to be compensated. Specifically, § 8.06 of the LLC Regulations state that:

> [t]he Manager shall receive compensation for his services and activities on behalf of the Company as determined by the Members from time to time, and he shall be reimbursed for all reasonable costs and expenses incurred by him on behalf of the Company.

LLC Regulations [Sc. Ex. B] at § 8.06. When questioned at trial, however, Greenblatt was unable to offer any evidence showing that H&M's sole member, Anglo American, had approved his salary. As such, the Court cannot find that the LLC Regulations entitle Greenblatt to a set

salary of $6,000 per month. Such finding, however, is not conclusive of whether Greenblatt's services qualify for administrative expense status under § 503(b).

At trial, Greenblatt's unrefuted testimony was that, although he received a prepetition salary of $6,000 per month, he stopped taking this salary about a month prepetition "because he didn't want to pick a fight" with Prospect, H&M's prepetition secured lender, whom Greenblatt believed would not permit him to receive a postpetition salary paid from its cash collateral. However, Greenblatt further testified that he continued to manage H&M and perform services on H&M's behalf after the bankruptcy filing. *See also* JPTO at 12, ¶ 25 ("After the filing of the Debtor's bankruptcy, Greenblatt continued to manage the Debtor and performed services on behalf of the Debtor."). According to Greenblatt, his postpetition services included "overseeing all the matters of the Debtor," including operations, financing, and making business decisions. He also testified that he spent significantly more time managing H&M postpetition than he did prepetition. Per Greenblatt, H&M required his services and he believed that the company would have been out of business otherwise. Greenblatt's unrefuted testimony clearly showed that he performed postpetition services as H&M's Manager and that those services benefited the estate.

Finally, the Court does not find persuasive the Trustee's argument that Greenblatt's failure to previously disclose his administrative claim is a ground for disallowance. First, the Court notes that H&M disclosed that Greenblatt served as its prepetition Manager at a salary of $6,000 per month. *See* Statement of Financial Affairs [Bankr. Case No. 12-32785, Dkt. No. 65] at 8 (question 23). And, although Greenblatt's salary does not appear on any Court-approved budgets, Greenblatt adequately explained why his salary was not budgeted for payment from Prospect's cash collateral and there is nothing in the record indicating that Greenblatt waived his right to seek allowance of an administrative claim for postpetition services rendered. Further,

Greenblatt openly appeared before this Court, and other parties in interest, as H&M's Manager. Therefore, there can be no argument that parties were unaware that Greenblatt was continuing to act as H&M's Manager postpetition or that Greenblatt's Wage Claim is contrary to a prior agreement to waive his salary. Thus, the Court finds that Greenblatt's failure to disclose his postpetition salary prior to filing his Wage Claim does not act as a bar to Greenblatt seeking allowance of an administrative claim for postpetition services rendered.

Accordingly, based upon Greenblatt's unrefuted testimony, the Court finds that (1) the $42,000 reflected in the Wage Claim arose from a transaction with H&M as a debtor-in-possession, (2) Greenblatt's services enhanced H&M's ability to function on a postpetition basis, and (3) Greenblatt's services were necessary for H&M to continue to operate on a postpetition basis. Further, the Court finds that a salary of $6,000 per month for the services of the sole Manager of H&M is reasonable compensation under the circumstances of this case. Accordingly, the Wage Claim will be allowed in the amount of $42,000 as an administrative priority claim against H&M's Chapter 11 estate.

### D.      Count 5:  Equitable Subordination (Brickley v. Greenblatt)

In Count 5, the Trustee asks the Court to subordinate Greenblatt's Wage Claim on the grounds that:  (1) Greenblatt's alleged breaches of fiduciary duty constitute the inequitable conduct necessary for equitable subordination, and (2) Greenblatt's actions caused substantial damages to H&M. Trustee's Pre-Trial Brief [Dkt. No. 125] at ¶ 55. The basis for the requested subordination is 11 U.S.C. § 510(c), which states, in relevant part, that:

> (c) Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may--
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest….

11 U.S.C. § 510(c).

In the Fifth Circuit, courts follow a three-prong test when considering a request for equitable subordination:  "(1) the claimant must have engaged in inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Code."  *Wooley v. Faulkner (In re SI Restructuring, Inc.)*, 532 F.3d 355, 360 (5th Cir. 2008) (citing cases).  Further, "a claim should be subordinated only to the extent necessary to offset the harm which the debtor or its creditors have suffered as a result of the inequitable conduct."  *Id.* at 360-61 (citing cases).

As discussed in § II.B.2, *supra*, the Court previously found that Greenblatt did not breach the fiduciary duties he owed to H&M as its Manager.  As such, those allegations cannot serve as a basis for equitable subordination.  Further, after a thorough review of the record, the Court could find no other conduct by Greenblatt that would warrant application of § 510(c) to Greenblatt's Wage Claim.  Finally, even if Greenblatt had participated in inequitable conduct, there is nothing in the record showing that (1) the alleged improprieties injured either H&M or its creditors, or (2) that Greenblatt benefited from such alleged actions.  Thus, the Court finds that the Trustee has failed to carry his burden of proof for equitable subordination of Greenblatt's Wage Claim, and thus concludes that the Trustee's equitable subordination claim fails.

### E.   Counterclaim: Indemnification Under the LLC Regulations and the DIP Agreement (Greenblatt v. H&M)

In his Answer and Counterclaim, Greenblatt alleges that he is entitled to indemnification for his attorneys' fees and costs incurred in defending this adversary proceeding under both the LLC Regulations and the DIP Agreement.  The Court will address these in turn.

### 1. Greenblatt Is Entitled to Indemnification Under the LLC Regulations.

Section 16.02 of the LLC Regulations state that:

Actions by Members.  In any threatened, pending or completed action or suit by or in the right of the Company or any Member, to which a Manager or Member is a party or is threatened to be made a party, involving an alleged cause of action by a Member or Members for damages arising from the activities of the Manager or Member in the management of the internal affairs of the Company as prescribed by these Regulations or by the laws of the State of Texas, or both, the **Company shall indemnify such Manager or Member against loss, liability or expense, including attorneys' fees, actually and reasonably incurred, if he or it acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company as specified in this section, except that no indemnification shall be made in respect of any claim, issue or matter as to which the Manager or Member shall have been adjudged to be liable for gross negligence, willful misconduct or breach of fiduciary obligation in the performance of his or its duty to the Company**, unless and only to the extent that the court in which such action or suit is brought shall determine upon application that, despite the adjudication of liability but in view of all circumstances of the case, the Manager or Member is fairly and reasonably entitled to indemnity for such expenses which such court shall deem proper.

LLC Regulations [Sc. Ex. B] at § 16.02 (emphasis added).

In his Post-Trial Brief, the Trustee alleges that Greenblatt is not entitled to indemnification under the LLC Regulations because:  (1) he "acted in bad faith and in a manner opposed to the best interest of H&M," and (2) he is liable to H&M for his "gross negligence,[31] willful misconduct, and/or his breach of fiduciary obligations."  Trustee's Post-Trial Brief [Dkt.

---

[31] Because the LLC Regulations do not define the term "gross negligence," the Court will turn to Texas law.  LLC Regulations [Sc. Ex. B] at § 19.02 (Governing Law).  According to the Texas Civil Practices and Remedies Code:

"Gross negligence" means an act or omission: (A) which when viewed objectively from the standpoint of the actor at the time of its occurrence involves an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and (B) of which the actor has actual, subjective awareness of the risk involved, but nevertheless proceeds with conscious indifference to the rights, safety, or welfare of others.

TEX. CIV. PRAC. & REM. CODE § 41.001(11); *see also e2 Creditors Trust v. Stephens, Inc. (In re e2 Communications, Inc.)*, 354 B.R. 368, 404 (Bankr. N.D. Tex. 2006) (relying on the definition of "gross negligence" contained in § 41.001 when analyzing indemnity provisions).

No. 172] at ¶ 82.[32]  As explained below, however, the Court disagrees with the Trustee on these points.

Because the Court has already found that Greenblatt acted within the scope of his fiduciary duties owed to H&M, and that his actions fell within the scope of the business judgment rule, the Court cannot find that his actions were grossly negligent or constituted willful misconduct.  *See* § II.B.2, *supra* for this Courts' analysis of the Trustee's breach of fiduciary duty claim.  As reflected by the record, and as discussed above, Greenblatt's actions were taken in good faith and in a manner that was not opposed to H&M's best interests.  As such, the Court finds and concludes that Greenblatt is entitled to indemnification under LLC Regulations § 16.02 for any "loss, liability or expense, including attorneys' fees, actually and reasonably incurred" in defending against the Complaint.

### 2.    Greenblatt Is Entitled to Indemnification Under the DIP Agreement.

The Court will now turn to Greenblatt's allegation that he is entitled to indemnification under § 8.4 of the DIP Agreement, which states:

> (b) Indemnification by the Debtors.  The Debtors shall indemnify the Lender [Scattered] and each Related Party of the Lender (each such Person being called an "Indemnitee") against, and to hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee **arising out of, in connection with, or as a result of** (i) the execution or delivery of this Agreement and each other or any agreement or instrument contemplated hereby, **the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions**[[33]] **or any other transactions contemplated hereby,** (ii) any Advance or the use of the proceeds therefrom, … or (iv) **any actual or prospective claim, litigation, investigation or proceeding relating to any of**

---

[32] The Court notes that the Trustee has not alleged independent claims against Greenblatt for negligence and/or willful misconduct, but is instead arguing those actions as express exceptions to the indemnification provision of the LLC Regulations.  Trustee's Pre-Trial Brief [Dkt. No. 125] at ¶ 82.

[33] "'Transactions' means the execution, delivery and performance by the Debtors of this [DIP] Agreement and the other agreements executed in connection herewith, the borrowing of Advances and the use of the proceeds thereof." DIP Agreement [Gr. Ex. H.1] at § 1.1(xx).

**the foregoing, whether based on contract, tort or any other theory** and regardless of whether any Indemnitee is a party thereto; provided, however, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and non-appealable judgment to have resulted solely from the gross negligence or willful misconduct of such Indemnitee.

DIP Agreement [Gr. Ex. H.1] at § 8.4(b) (emphasis added). As stipulated by the parties, the indemnity provisions of § 8.4(b) survived termination of the DIP Agreement. JPTO at 15, ¶ 66.

The Trustee attacks Greenblatt's claim for indemnification under the DIP Agreement on multiple fronts, including that: (1) the indemnity provision does not extend to Greenblatt as H&M's Manager; (2) the acts alleged in the Complaint do not fall within the scope of the indemnity provision; (3) the indemnification does not comply with the fair notice requirements of Texas law; and (4) Scattered's breach of the DIP Agreement bars Greenblatt's indemnification claim. Trustee's Pre-Trial Brief [Dkt. No. 125] at ¶¶ 60-71. Because the Court previously found that Scattered did not breach the DIP Agreement, *see* § II.A.1, *supra*, this Memorandum Opinion will only address the first three of the Trustee's arguments.

### a) Greenblatt, in His Capacity as H&M's Manager, Qualifies as an "Indemnitee" Under the Terms of the DIP Agreement.

The Trustee argues that the indemnification provision does not extend to Greenblatt, in his capacity as H&M's Manager, for several reasons. First, the Trustee argues that, in his Counterclaim, Greenblatt only claimed indemnification as an officer of Scattered; however, Greenblatt has been sued in his capacity as H&M's Manager. Second, the Trustee argues that his breach of fiduciary duty claim against Greenblatt arises independent of the DIP Agreement and the parties' performance thereunder. Finally, the Trustee argues that the indemnity provision does not comply with applicable law. The Court will address these arguments in turn.

The Trustee argues first that, in his counterclaim, Greenblatt has only alleged indemnification as an officer of Scattered. Specifically, the Trustee cites to "Def.'s Countercl.

12,"[34] which the Court will interpret as a reference to paragraphs 117-120 of the Answer and Counterclaim, which state:

> 117. In addition, paragraph 8.4(b) of the DIP Loan requires H & M to indemnify and hold Greenblatt harmless from any and all losses, claims, damages, liabilities and related expenses, including the fees, charges and disbursements of any counsel for Greenblatt, for any claims asserted against Greenblatt arising out of, in connection with, or as a result of the execution or performance of the DIP Loan, based on any theory, including tort theory of liability. Greenblatt asserts that his actions, if any, in the performance of the DIP Loan were not grossly negligent as he believes they were in compliance with the specific terms of the joint operating agreement and the DIP Loan and thus also not the product of willful misconduct. All to the contrary, any actions on his part were in good faith and reasonable.

> 118. The definition of Indemnitee contained in paragraph 8.4 (b) of the DIP Loan includes any Related Party to the Lender. The Lender is Scattered Corporation.

> 119. The definition of "Related Parties" contained in the DIP Loan includes affiliates of the Lender, and their respective directors, officers, employees, agents, attorneys and advisors of the Lender.

> 120. The Trustee has asserted in the Complaint that Greenblatt was the Secretary for Scattered Corporation.

Amended Answer and Counterclaim [Dkt. No. 63] at 12, ¶¶ 117-120.[35] Although the Court believes that the Amended Answer and Counterclaim could have been more artfully drafted, the Court finds that the Trustee's interpretation of the Counterclaim, which appears to focus on paragraph 120 without regard the language of the surrounding paragraphs, is far too restrictive. The Counterclaim must be read in its entirety, and the Court will not read paragraph 120 as an express limitation on the allegations contained in paragraphs 117-119 of the Counterclaim.

Accordingly, the Court finds that Greenblatt has alleged that he is entitled to indemnification under § 8.4(b) of the DIP Agreement as a "Related Party" indemnitee. As such,

---

[34] Trustees' Pre-Trial Brief [Dkt. No. 125] at ¶ 78.

[35] In turn, paragraphs 115-116 of the Counterclaim relate to Greenblatt's claim for indemnification under the LLC Regulations.

the relevant inquiry now becomes whether Greenblatt does, in fact, qualify as an Indemnitee under the express terms of the DIP Agreement.

Section 8.4(b) of the DIP Agreement states that "[t]he Debtors shall indemnify the Lender [Scattered] and each Related Party of the Lender (each such Person being called an "Indemnitee") ...."  DIP Agreement [Gr. Ex. H.1] at §8.4(b).  As such, the Court's analysis must focus on the parameters of the term "Related Party."  Of relevance here, the DIP Agreement contains the following definitions:

> Related Parties means, with respect to any specified Person [Scattered], such Person's Affiliates and the respective directors, officers, employees, agents, attorneys and advisors of such Person and such Person's Affiliates.

> Person shall mean any natural person, corporation, limited liability company... or other entity.

> Affiliates means, with respect to a specified Person [Scattered], another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person Specified [Scattered].

> Control means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise.

As stipulated by the parties, H&M is owned 100% by Anglo American and Anglo American is owed 100% by Scattered.  JPTO at 11, ¶¶ 13, 16.  Based upon the unambiguous language of the DIP Agreement, coupled with the parties' stipulations, it is clear that, at the relevant time, Scattered owned and controlled Anglo American, and, in turn, Anglo American owned and controlled H&M.  As such, both Anglo American and H&M were Affiliates of Scattered.  As an Affiliate of Scattered, H&M's directors, officers, employees, agents, attorneys and advisors each qualified as a Related Party.  Thus, the Court finds that, as H&M's Manager, Greenblatt qualifies as an Indemnitee under § 8.4(b) of the DIP Agreement.

**b)** **The Indemnification Provision Covers the Activities that are the Subject of the Complaint.**

Next, the Trustee argues that Greenblatt's alleged breaches of fiduciary duty arise independently from the DIP Agreement and, as such, do not fall within the scope of DIP Agreement's indemnity provision. To analyze this argument, the Court must consider the relevant provisions of the DIP Order, the DIP Agreement, and the Complaint.

The DIP Order shows that the primary purpose of the DIP Agreement was to provide funding for H&M's drilling program. "H&M, having advised the Court that it intends to undertake a drilling program to increase the value of its bankruptcy estate, does not have sufficient available sources of working capital or cash to operate its business without the proposed DIP Financing from [Scattered]. … Given the need to undertake drilling to maintain lease rights, absent the granting of relief as requested herein, the Debtors and their estates will suffer immediate and irreparable harm." DIP Order [Gr. Ex. I.1] at ¶ F.

Turning next to the DIP Agreement, § 8.4(b) states, in relevant part, that:

> [t]he **Debtors shall indemnify [each Indemnitee] against**, and to hold each Indemnitee harmless from, any and **all losses, claims, damages, liabilities** and related expenses, including the fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee **arising out of, in connection with, or as a result of** (i) the execution or delivery of this Agreement and each other or any agreement or instrument contemplated hereby, **the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions[1] or any other transactions contemplated hereby … or (v) any actual … litigation … relating to any of the foregoing,** whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto….

DIP Agreement [Gr. Ex. H.1] at § 8.4(b) (emphasis added). The plain and unambiguous language of this provision contains an indemnification for damages and liabilities, including attorneys' fees and expenses, "arising out of, in connection with, or as a result of" the parties' performance under the DIP Agreement.

**MEMORANDUM OPINION** 58

Finally, a review of the Complaint shows that each of Greenblatt's alleged breaches arise out of, in connection with, or as a result of H&M's performance under the DIP Agreement while Greenblatt was its Manager.  Indeed, the Trustee summarizes the alleged breaches in his post-trial brief, generally as follows:  (1) failing to timely pay for drilling costs [from funds drawn under the DIP Agreement], (2) failing to timely request funds under the DIP Agreement to pay drilling and completion costs, (3) instructing Jones to delay the first draw under the DIP Agreement, (4) allowing H&M to be declared a non-consenting party for failure to prepay expenses [from funds drawn under the DIP Agreement], (5) subjecting H&M to significant risk for failure to pay completion costs [from funds drawn under the DIP Agreement], (6) creating a situation whereby H&M was immediately in default under the cash collateral order [by failing to prepay completion costs with funds drawn under the DIP Agreement], (7) failing to timely take action against Scattered for refusing to fund the Disputed DIP Requests, (8) putting H&M's access to DIP financing at risk, and (9) putting H&M's acreage at risk for failure to meet drilling obligations [by failing to draw funds under the DIP Agreement].  *See* Trustee's Post-Trial Brief [Dkt. No. 172] at ¶ 11.  Clearly, the Trustee's allegations would not exist absent the DIP Agreement and, as such, do not arise independently from the DIP Agreement (as alleged by the Trustee) so as to remove Greenblatt from the ambit of the agreement's indemnity provision.

Accordingly, based upon the plain and unambiguous language of the DIP Agreement, the Court finds and concludes that Greenblatt is an "Indemnitee" under the DIP Agreement and that his alleged actions arose out of, in connection with, or as a result of H&M's performance under the DIP Agreement, while Greenblatt was acting as its Manger, and fall under the scope of the indemnity provisions of § 8.4(b) of the DIP Agreement.  Thus, Greenblatt is entitled to indemnification for "all losses, claims, damages, liabilities and related expenses, including the

fees, charges and disbursements of any counsel" incurred in defending against the Trustee's claims against him.  DIP Agreement [Gr. Ex. H.1] at § 8.4(b).

> **c)**     **The Indemnification Provision of the DIP Agreement is Enforceable Under Applicable Law.**

Now that the Court has determined that Greenblatt qualifies as an Indemnitee under the DIP Agreement and that the Trustee's claims are within the scope of § 8.4(b) of the DIP Agreement, it must determine whether § 8.4(b) is enforceable under applicable law.  In arguing that § 8.4(b) is not enforceable, the Trustee alleges that:  (1) the DIP Agreement is an ambiguous contract that must be construed against Scattered and in favor of H&M, and (2) the indemnity provisions do not comport with the "fair notice" requirements under Texas law.  The Court will address these arguments in turn.

First, the Trustee argues that the DIP Agreement, particularly the indemnity provision, is ambiguous and should be construed against Scattered and in favor of H&M.  Trustee's Pre-Trial Brief [Dkt. No. 125] at ¶¶ 62, 64-65.  When pressed at trial, however, the Trustee's counsel admitted that his allegations of ambiguity were not pleaded in the Complaint or in his answer to the Answer and Counterclaim.  Further, although the issue of ambiguity is found in the JPTO, it was included with the express annotation that both Scattered and Greenblatt objected to its inclusion because it was outside the scope of the Trustee's pleadings.  JPTO at 45, ¶ 183 ("Contested Issues of Law")

Given the Trustee's failure to plead ambiguity and the Defendants' objection to its inclusion in the JPTO, the Court concludes that the Trustee waived his argument that the DIP Agreement is ambiguous.  *Arsement v. Spinnaker Exploration, Co., LLC,* 400 F.3d 238, 246 (5th Cir. 2006) ("It goes without saying that a pre-trial order controls the scope and course of trial; a claim or issue not included in the order is waived, unless presented at trial without objection).

Nonetheless, the Court has reviewed the DIP Agreement and finds that the document, including the indemnity provision, is not ambiguous and will, therefore, decline the Trustee's request that the indemnity provisions be construed against Scattered.[36]

The Trustee next argues that, under Texas law, the indemnity provision of the DIP Agreement is unenforceable. Trustee's Pre-Trial Brief [Dkt. No. 125] at ¶¶ 66-71. According to the Trustee, to be enforceable, the indemnity provision must satisfy the "fair notice" requirements, which include: (1) the "express negligence rule," and (2) the conspicuousness requirement. *Dresser Indus. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 508 (Tex. 1993). As summarized by the Texas Supreme Court:

> A contract which fails to satisfy either of the fair notice requirements when they are imposed is unenforceable as a matter of law. *See Dresser Indus., Inc. v. Page Petroleum, Inc.*, 853 S.W.2d 505, 509–10 (Tex. 1993); *see also U.S. Rentals, Inc. v. Mundy Serv. Corp.*, 901 S.W.2d 789, 792 (Tex. App. – Houston [14th Dist.] 1995, writ denied). One fair notice requirement, the express negligence doctrine, requires that "the intent of the parties must be specifically stated in the four corners of the contract." *Ethyl Corp. v. Daniel Constr. Co.*, 725 S.W.2d 705, 707 (Tex. 1987). The other requirement, of conspicuousness, mandates "that something must appear on the face of the [contract] to attract the attention of a reasonable person when he looks at it." *Dresser*, 853 S.W.2d at 508 (quoting *Ling & Co. v. Trinity Sav. & Loan Ass'n*, 482 S.W.2d 841, 843 (Tex. 1972)). Language may satisfy the conspicuousness requirement by appearing in larger type, contrasting colors, or otherwise calling attention to itself. *Littlefield v. Schaefer*, 955 S.W.2d 272, 274–75 (Tex. 1997). However, if both contracting parties have actual knowledge of the [benefits] plan's terms, an agreement can be enforced even if the fair notice requirements were not satisfied. *Dresser*, 853 S.W.2d at 508 n.2 (citing *Cate v. Dover Corp.*, 790 S.W.2d 559, 561 (Tex. 1990)).

*Storage Processors, Inc. v. Reyes*, 134 S.W.3d 190, 192 (Tex. 2004) (footnote omitted).

As to the conspicuousness requirement, an indemnity clause must satisfy the standard of conspicuousness in the Texas Business and Commerce Code. *Dresser*, 853 S.W.2d at 511 ("We thus adopt the standard for conspicuousness contained in the [Business & Commerce] Code for

---

[36] The Court also notes that there is no evidence in the record indicating which party drafted the DIP Agreement.

indemnity agreements ….  When a reasonable person against whom a clause is to operate ought to have noticed it, the clause is conspicuous."); *Enron Corp. Sav. Plan. v. Hewitt Assocs., L.L.C.*, 611 F. Supp. 2d 654, 672 (S.D. Tex. 2009).  Pursuant to the Texas version of the Uniform Commercial Code:

> "[c]onspicuous," with reference to a term, means so written, displayed, or presented that a reasonable person against which it is to operate ought to have noticed it.  Whether a term is "conspicuous" or not is a decision for the court. Conspicuous terms include the following:  (A) a heading in capitals equal to or greater in size than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same or lesser size; and (B) language in the body of a record or display in larger type than the surrounding text, or in contrasting type, font, or color to the surrounding text of the same size, or set off from surrounding text of the same size by symbols or other marks that call attention to the language.

TEX. BUS. & COMM. CODE § 1.201(10).

The indemnification provision at issue here is found in Article 8 of the DIP Agreement titled "Miscellaneous," which contains a hodgepodge of 12 sections addressing matters ranging from where notices should be sent and the validity of the electronic transmission of documents to execution of the document in multiple counterparts and the severability of provisions.  Tucked in among these is § 8.4, which is titled "Expenses: Indemnity: Damage Waiver."  The text of Section 8.4(b) is neither in capitals nor bold.  Instead, the font matches that contained in various other provisions of the DIP Agreement, including the more mundane provisions of Article 8. There is simply nothing in the text or presentation of § 8.4(b) that sets it apart from the remainder of the agreement or that would otherwise draw a reasonable person's notice.

Accordingly, the Court finds that § 8.4(b) fails to meet the conspicuousness requirement under Texas law.  And, because the fair notice elements are interpreted in the conjunctive, the Court need not address whether the provision meets the express negligence rule.  Thus, unless an exception to the fair notice requirements applies, the indemnification provision is not enforceable under Texas law.

As stated above, however, an exception to the fair notice requirements exists when the indemnitor had actual notice or knowledge of the indemnification provision. *Cleere Drilling Co. v. Dominion Expl. & Prod., Inc.*, 351 F.3d 642, 647 (5th Cir. 2003) ("Even if we assume … that the pertinent language of the Contract is not sufficiently conspicuous to meet the second prong of the subject test, we are convinced that the requirement of fair notice—both elements, *i.e.,* express negligence and conspicuousness—is irrelevant in the face of Dominion's actual knowledge of the subject provisions of the Contract."); *Dresser,* 853 S.W.3d at 508 n.2. This exception is a question of fact. *Enron*, 611 F. Supp. 2d. at 674. "Actual notice or knowledge is in the nature of an affirmative defense to a claim of lack of fair notice." *U.S. Rentals*, 901 S.W.2d at 793. Therefore, the indemnitee bears the burden of proving notice or knowledge of the agreement. *Id*. Types of evidence that an indemnitee can use to meet its burden include evidence of specific negotiation of the indemnity, evidence of prior dealings of the parties, or "proof that the provision had been brought to the indemnitor's attention." *Enron*, 611 F. Supp. 2d. at 673.

Here, there is no doubt in the Court's mind that H&M was aware of the indemnification provision in the DIP Agreement. Notably, the DIP Agreement was approved by this Court at H&M's specific request. *See* DIP Order [Gr. Ex. I.1] at 1 ("Came on to be considered the Debtor's Application…."); JPTO at 12, ¶ 26 ("On July 2, 2012, H&M sought the Court's approval to enter into a post-petition loan agreement with Scattered [Doc. No. 87].").  Indeed, the motion for approval of the DIP Agreement was filed and prosecuted on H&M's behalf by its bankruptcy counsel, Anderson Tobin, PLLC, a firm with a not insignificant bankruptcy practice. *See id*. at 12 (reflecting signature of attorney Aaron Tobin of Anderson Tobin, PLLC on H&M's behalf).  Indemnity provisions, like the one contained in the DIP Agreement, are almost always included in debtor-in-possession financing agreements, as any experienced bankruptcy counsel

knows.  Further, although the Trustee himself may not have had actual knowledge of § 8.4(b) of the DIP Agreement, because negotiation and execution of the document occurred prior to his appointment, it is H&M's knowledge on this point that is relevant.  Based on the facts of this case, the Court concludes that it is appropriate to impute H&M's actual knowledge of the indemnity provision to the Trustee.  *See, e.g., Askanase v. Fatjo*, 130 F.3d 657, 666-67 (5th Cir. 1997) (addressing imputation of officers' and directors' knowledge to debtor and, thus, to court-appointed trustee of debtor's bankruptcy estate).

After careful consideration of the facts, the Court finds that H&M, acting through Greenblatt as its Manager, had actual knowledge of the indemnification provision set forth in the DIP Agreement.  Thus, the Court concludes that the indemnification provision found at § 8.4(b) of the DIP Agreement is enforceable and need not comply with the fair notice requirements.

### 3.   Determination of the Amount and Priority of Greenblatt's Claims for Indemnification Under the LLC Regulations and the DIP Agreement.

The Court will now turn to the amount and priority of Greenblatt's claims for indemnification.  Initially, Greenblatt requested indemnification for his attorneys' fees incurred in defending against the Trustee's claims in the amount of $427,227.50 and $28,861.10 in related expenses, plus prospective fees in the event that a judgment in Greenblatt's favor is appealed.[37] Affidavit of Rosa Orenstein [Gr. Ex. R.4] at ¶¶ 8 – 9.  The Trustee objected to certain of these fees at the hearing and, as a result, Greenblatt modified his request to $420,710[38] in attorneys' fees and $28,831.40 in expenses, plus prospective fees in the event that a judgment in

---

[37] The requested amounts are: (1) $30,000 for post-trial motions before this Court, (2) $35,000 for an appeal to the district court, (3) $25,000 for an appeal to the Fifth Circuit, (4) $25,000 for an application for writ of certiorari to the U.S. Supreme Court, and (5) $15,000 if that writ is granted.  Affidavit of Rosa Orenstein [Gr. Ex. R.4] at ¶ 9.

[38] Gr. Ex. R.4.A lists initial fees requested as $427,227.50, with voluntary reductions of $6,220.  While on the stand, however, Greenblatt's counsel testified that an additional fee reduction of $297.50 was accidentally excluded, so that voluntary reductions totaled $6,517.50, not $6,220; thus total requested fees total $420,710, not the $421,007.50 reflected on Gr. Ex. R.4.A.

Greenblatt's favor is appealed. Revised Fee Summary [Gr. Ex. R.4.A]. With these agreed-upon reductions, the Trustee's counsel stated on the record that, subject to this Court's *in camera*[39] review of the unredacted time entries and verification that none relate to a separately-pending adversary,[40] the Trustee had no further objection to the amounts requested.

Based upon its independent review of Gr. Ex. R.4.C, the Court finds that an additional $565.00 in fee reductions is appropriate, as follow:

| Date | Timekeeper | Rate | Hours | Reduction |
|---|---|---|---|---|
| 11/14/13 | NMN | $225 | .1 | $22.50 |
| 11/15/13 | NMN | $225 | 1.1 | $247.50 |
| 11/18/13 | NMN | $225 | .2 | $45.00 |
| 12/05/13 | NMN | $225 | .5 | $112.50 |
| 12/10/13 | NMN | $225 | .5 | $112.50 |
| 01/29/14 | NMN | $250 | .1 | $25.0 |
| **Total:** | | | | **$565.00** |

Each of the above-referenced entries appears to be related to the 1519 Main Adversary Proceeding and, based upon the information provided in Gr. Ex. R.4.B, was not previously removed from Greenblatt's calculation.

With this additional reduction, the Court finds that Greenblatt is entitled to indemnification for $420,145 in attorneys' fees incurred in defending against the Trustee's claims and $28,831.40 in related expenses, plus the following amounts should the Trustee appeal the judgment to be entered in accordance with this Memorandum Opinion: (1) $30,000 for post-trial motions before this Court, (2) $35,000 for an appeal to the district court, (3) $25,000 for an appeal to the Fifth Circuit, (4) $25,000 for an application for writ of certiorari to the U.S. Supreme Court, and (5) $15,000 if that writ is granted. Further, the Court finds that such

---

[39] Unredacted copies of the invoices underlying Greenblatt's indemnity claim were admitted into evidence under seal and provided to the Court for *in camera* review. Invoices [Gr. Ex. R.4.C].

[40] *Brickley v. Greenblatt*, Adv. Proc. No. 13-3214 (the "**1519 Main Adversary Proceeding**").

amounts represent reasonable attorneys' fees and expenses in relation to this adversary proceeding and any resulting appeal.

Now that the Court has determined the amount of Greenblatt's indemnification claim, it will turn to the priority of such claim. Greenblatt argues, and the Trustee agrees, that any allowed indemnification claim arising under the DIP Agreement should be entitled to priority as an administrative claim against H&M's Chapter 11 bankruptcy estate, while any allowed indemnification claim arising under the LLC Regulations should be classified as a general unsecured claim. *See* Plaintiff Douglass J. Brinkley's Post-Trial Brief [Dkt. No. 172] at ¶ 22 ("Thus, if this Court finds that Mr. Greenblatt is entitled to indemnification under the DIP Agreement, it would appear that Mr. Greenblatt would be entitled to assert a Chapter 11 administrative expense claim…. Similarly, if the Court concludes that Mr. Greenblatt is entitled only to indemnification under H&M's Amended Regulations, … then Mr. Greenblatt's indemnification claim should be an unsecured claim."); Leon A. Greenblatt, III's Post Trial Brief [Dkt. No. 172] at ¶ 31 ("Greenblatt's indemnification claim under the DIP Agreement is asserted as a Chapter 11 administrative expense claim….", while indemnification under the LLC regulations would be a general unsecured claim.). Despite the parties' agreement on this issue, the Court will nonetheless analyze the asserted priority for each claim.

As explained in § II.C, *supra*, to be entitled to administrative expense priority, a claim must meet the requirements of 11 U.S.C. § 503(b). According to the Fifth Circuit,

> In order to qualify as an "actual and necessary cost" under section 503(b)(1)(A), a claim against the estate must have arisen postpetition and as a result of actions taken by the trustee that benefitted the estate. *See Toma Steel Supply, Inc. v. Transamerican Natural Gas Corp. (In the Matter of Transamerican Natural Gas Corp.)*, 978 F.2d 1409, 1416 (5th Cir. 1992) (finding that a "prima facie case under § 503(b)(1) may be established by evidence that (1) the claim arises from a transaction with the debtor-in-possession; and (2) the goods or services supplied enhanced the ability of the debtor-in-possession's business to function").

*Total Minatome Corp. (In the Matter of Jack/Wade Drilling, Inc.),* 258 F.3d 385, 387 (5th Cir. 2001); *see also Lasky,* 262 B.R at 918 (N.D. Tex. 2001) ("Accordingly, an expense is entitled to administrative priority treatment only if (1) it results from a transaction between the claimant and the trustee of the bankruptcy estate or a debtor in possession; and (2) the benefit to the debtor, and hence the right to payment, accrues post-petition."), *aff'd,* 288 F.3d 730 (5th Cir. 2002). The Court will address the two factors established by the Fifth Circuit in turn.

First, it is undisputed that Greenblatt's indemnification claim under the DIP Agreement arises from a postpetition transaction between debtor-in-possession H&M and Scattered. *See* JPTO at 12, ¶¶ 26-28. Further, as discussed in § II.E.2.b), *supra,* the Trustee's allegations against Greenblatt all arise out of, in connection with, or as a result of H&M's performance under the DIP Agreement while Greenblatt was its Manager. Thus, the Court finds that Greenblatt has satisfied the first prong.

Second, the purpose behind H&M and Scattered entering into the DIP Agreement was to supplement H&M's use of cash collateral so that it could undertake its drilling program. As reflected in the DIP Order, which was agreed to by H&M's counsel, "[t]he ability of the Debtors to immediately obtain sufficient working capital and liquidity through the DIP Financing is vital to the preservation and maximization of the value of the Debtors' assets and properties…. Given the need to undertake drilling to maintain lease rights, absent the granting of the relief as requested herein, the Debtors and their estates will suffer immediately and irreparable harm." DIP Order [Gr. Ex. I.1] at ¶ F. Further, the evidence shows that (1) H&M requested $800,000 in advances, (2) Scattered funded the full amount requested, and (3) the funds advanced by Scattered to H&M were of benefit to the estate. Although the fees and expenses incurred by Greenblatt did not themselves benefit the estate, Scattered's lending under the DIP Agreement

clearly did and the postpetition agreement to indemnify was incurred so that H&M could receive the funding it required. Thus, the Court finds that Greenblatt has also met the second prong. Accordingly, the Court concludes that Greenblatt's indemnification claim under the DIP Agreement should be allowed as an administrative expense of H&M's Chapter 11 estate.

As noted previously, Greenblatt also alleges that he is entitled to indemnification under the terms of the LLC Regulations. Because Greenblatt does not allege that this claim is entitled to priority, the Court need not analyze the claim under 11 U.S.C. § 503(b). *See* Greenblatt's Post-Trial Brief [Dkt. No. 170] at ¶ 31. Accordingly, and in the event that this Court erred in allowing Greenblatt's indemnification claim under the DIP Agreement, the Court concludes that Greenblatt's indemnification claim under the LLC Regulations should be allowed as a general unsecured claim in H&M's bankruptcy case.

## III. CONCLUSION

For the reasons explained herein, the Trustee takes nothing by his Complaint. Greenblatt is entitled to a judgment in his favor on his counterclaim for indemnification under the DIP Agreement in the amount of $448,976.40, plus prospective costs in the event that such judgment is appealed in the following amounts: (1) $30,000 for post-trial motions before this Court, (2) $35,000 for an appeal to the district court, (3) $25,000 for an appeal to the Fifth Circuit, (4) $25,000 for an application for writ of certiorari to the U.S. Supreme Court, and (5) $15,000 if that writ is granted, which shall be allowed as an administrative expense claim against H&M's Chapter 11 bankruptcy estate. Alternatively, if the Court erred in allowing Greenblatt's indemnification claim under the DIP Agreement, Greenblatt is entitled to a judgment in his favor on his counterclaim for indemnification under the LLC Regulations in the same amounts, which shall be allowed as a prepetition general unsecured claim in H&M's bankruptcy case.

**MEMORANDUM OPINION**                                                                                  **68**

A judgment reflecting this ruling shall be entered separately. The Court hereby directs the parties' counsel to confer with each other and attempt to submit an agreed form of judgment consistent with this Memorandum Opinion to the Court within ten days of the entry of this Memorandum Opinion on the Court's docket. If no agreement can be reached, each party shall submit its own proposed form of judgment on or before the tenth day after entry of this Memorandum Opinion on the Court's docket, along with an explanation of why the other side's proposed judgment is improper.

### # # # END OF MEMORANDUM OPINION # # #